RECEIVED

MAR 24 2014

United States Court of Appeals
For The Federal Circuit

2014-1318

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

WALTER ALBECKER,

Plaintiff-Appellant,

v.

CONTOUR PRODUCTS INC. (FL),

Defendant-Appellee

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS E.D. IN 09 CV 631, JUDGE EDMOND E. CHANG

---

***PRO SE* BRIEF** OF PLAINTIFF-APPELLANT WALTER ALBECKER

WALTER ALBECKER
1074 W. TAYLOR, No. 326
Chicago, IL 60607
(800) 975-7005
PLAINTIFF-APPELLANT *PRO SE*

March 20, 2014

FORM 12. Informal Brief (District Court, Court of International Trade, and Court of Federal Claims Cases)

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Walter Albecker v. Contour Products, Inc.

No. 14-1318

## INFORMAL BRIEF OF APPELLANT

Read the Guide for Pro Se Petitioners and Appellants before completing this form. Attach a copy of the final decision or order of the trial court. Answer the following questions as best you can. Your answers should refer to the decision or order you are appealing where possible. Use extra sheets if needed.

1. Have you ever had another case in this court? [ ] Yes [✓] No If so, state the name and number of each case.

2. Did the trial court incorrectly decide or fail to take into account any facts? [✓] Yes [ ] No If so, what facts? (Refer to paragraph 7 of the Guide.)

   The trial court improperly imported limitations from other claims, misinterpreted the '653 Patent's special definition, and did not take into account Claim 11 -- which Appellant believes is THE most critical evidence in construing the term "secured to".

3. Did the trial court apply the wrong law? [✓] Yes [ ] No If so, what law should be applied?

   The trial court improperly acted as the trier of fact, despite the fact that all the elements of the construed claims were present in the accused embodiment. The district court then added an additional element to say no reasonable jury would find infringement. The jury should act as the trier of fact.

4. Did the trial court fail to consider important grounds for relief? [✓] Yes [ ] No If so, what grounds?

   The trial court refused to allow Appellant to amend final infringement contentions after the trial court effectively changed the the claim construction -- going from requiring an "attachment means" to requiring that pieces had to be separate before being attached.

**FORM 12. Informal Brief (District Court, Court of International Trade, and Court of Federal Claims Cases) (continued)**

5. Are there other reasons why the trial court's decision was wrong? [✓] Yes [ ] No If so, what reasons?

   The district court strained to harmonize (or overlook) important evidence that should have superceded the out of context, erroneous, and questionable evidence the district court relied upon.

6. What action do you want the court to take in this case?

   Reverse the district court's erroneous claim construction, to construe the term "secured to" as "attached to", without limitations. To further remand the case for a jury determination on the question of infringement.

7. Do you want to argue before the court in person? [ ] Yes [ ] No If yes, what are the reasons why argument will aid the court? (Refer to paragraph 15 of the Guide.)

   Plaintiff-Appellant can go either way on this. IF the COURT feels that argument would aid the Court, Appellant would welcome the opportunity. However, Appellant feels the briefs will probably be sufficient.

8. Do you intend to represent yourself? [✓] Yes [ ] No If you have not filed an Entry of Appearance, indicate your full name, address, and telephone number.

   Walter Albecker
   1137 W. Taylor, No. 326
   Chicago, IL 60607
   800 975-7005 ext. 4

9. I certify that a copy of this brief and any attachments was sent to: J. Mark Wilson, Moore & Van Allen PLLC, the attorney for appellee, at the following address: 100 N. Tryon Street, Suite 4700. (Address is found on the Entry of Appearance served on you by the attorney for the appellee. If you do not send a copy of this brief to the appellee, the court will not file the brief.)

______________________ Date

______________________ Appellant's signature

In addition to mailing a copy to the attorney for the appellee, mail an original and three copies of this informal brief and attachments to:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

**Statement on Format of Brief**

In the following pages, Plaintiff-Appellant Albecker will seek to more fully answer the questions on CAFC Form 12 (*Pro Se* Informal Brief). At the heart of this appeal is the construction of the claim term "secured to", in Plaintiff-Appellant's US Patent No. 5,836,653. In view of the *de novo* standard for this appeal, Appellant will also state the background of the case.

**Introduction**

Plaintiff is asking this Court to take a fresh look at this case, because though the district court (on a motion to reconsider) corrected a very serious error – the district court failed to disentangle the numerous interconnected factors that were in place because of the error. In the present case, there were two district judges, and Plaintiff would submit that the first judge (Judge Rueben Castillo) strained to harmonize critical facts with its erroneous understanding that Plaintiff-Appellant Albecker had disclaimed certain embodiments as well as claim 11. When the case was transferred, and the second judge (Edmond Chang), corrected the erroneous understanding of the issue of disclaiming, but then strained to try to harmonize clear facts with the previous erroneous claim construction. Plaintiff would respectfully request that this Court begin by giving consideration to the 'big picture', as set forth on the table on the next page – to quickly see all of the interconnected elements related to the claim construction at issue.

# '653 Patent: Quick Overview of "integral and continuous"

## Specification

**Multiple Disclosed Embodiments**
[w/ integral top cushion]

Figure 4C

Figure 1E

**Special Definition for -- 26s**
"... 42s is a foundation that has an integral and continuous top cushion 26s on it ... For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion 26s, and though it may be technically the same material, it is considered as a foundation with a top cushion."

**Integral & Continuous = "more secure"**
"... the upholstery bag would have about 6" of material extending at the open end beyond the cushion ... This type of construction could be simpler than attaching straps, as well as somewhat more secure."

**OBJECTS ... OF INVENTION**
"(i) To provide leisure chairs/backrests that are substantial, secure, and well made." (emphasis added throughout)

## Claims

**First Dependent Claim After Generic Claim:** 11. The backrest/leisure chair of claim 10 wherein the top cushion is integral and continuous with the generally wedge shaped foundation.

**Surrounding Words:** District court adopted special definition for integral and continuous top cushion 26s: "... the top 4" of material on the face of the foundation ... " [Thus the "top cushion" in claim 10 can be 26s – integral and continuous.]

## Prosecution History

Examiner made changes to specification for FIG. 1E. Examiner called Appellant to discuss both withdrawn and non-withdrawn claims, and required cancellation of a withdrawn claim. Examiner approved and initialed changes to three pages of drawings, including to integral and cont. FIG. 1E.

- Examiner allowed claim 11.

## Ordinary Meaning

**PHOSITA:** Defendant/Appellee's CEO's US Patent application No. 11/399,739 for Portable Support Cushion: "permanently securing the two sections 101, 102 together" AND "having sections 301, 302 permanently attached to each other" [referring to integral and continuous]

**Federal Circuit:** *Toro v. White,* 98-1334 "restriction ring (76) is attached to the air inlet cover" [referring to integral and continuous]

**'653 Patent**: "attached to" (p. 9, lines 47-49) [referring to integral and continuous]

**2. Did the trial court incorrectly decide or fail to take into account any facts?** (from CAFC Form 12)

A: **YES**

**Manifest Errors:** Plaintiff/Appellant would submit that there are two manifest errors in the district court's September 27th Opinion, which he would respectfully request that the Court give special attention to. The first deals with the prosecution history regarding Claim 11, and Appellant will set forth as a question as below:

> *Does the prosecution record show that the PTO examiner discussed withdrawn claims with Appellant?*

Plaintiff will try to set this up, with both the context and significance:

**Claim 11 was properly ALLOWED**

The district court erred by ignoring the most important element in the present case – Claim 11. Claim 11 states:

> 11. The backrest/leisure chair of claim 10 wherein the top cushion is integral and continuous with the generally wedge shaped foundation.

The district court erroneously found that Plaintiff Appellant's claim 11 remained withdrawn after the application's restriction:

> Although Albecker asserted that claims 11 and 21 (the claims that would become claims 10 and 20 in the '653 Patent) are generic, the record does not show that the examiner ever agreed.2 Thus, all of the withdrawn claims—including the new claim 11—remained withdrawn after the application's restriction. 37 C.F.R. § 1.146; *St. Jude Med., Inc. v. Access Closure, Inc.*, — F.3d —, 2013 WL 4826148, at *7(Fed. Cir. Sept. 11, 2013) ("Since no

generic claim was applied for, and no such claim was finally held allowable, that is what occurred: the election of species in the grandparent created a *restriction*."). Ultimately, Albecker, in the eyes of the PTO, did not pursue a one-piece invention.[3] *Order* September 27, 2013 p. 9-10

The district court made a manifest error of fact, where on p. 9, in footnote 2, the district court stated:

> "[2]Albecker appears to allege that he discussed the withdrawn claims with the examiner by phone, *see* R. 86 at 2-4, but the examiner's Interview Summary only discloses that claims 1, 4, 11, and 21 were discussed and that "[s]ome changes were agreed upon to better define the claims over the prior art, and an amendment will be faxed for further consideration." Def.'s Exh. A at 93. <u>The examiner never recorded that he discussed Albecker's withdrawn claims at all.</u> ...Thus, there is no evidence in the documentary record that the examiner ever orally agreed that the withdrawn claims could be reinstated, or that the examiner ever orally found that any claim was generic." (<u>emphasis added</u>)

This incorrect notion came directly from Defendant's untrue statement in their Markman Brief:

> "In a follow-up telephone interview, the Examiner noted that he discussed with Albecker claims 1, 4, 11 and 21 (none of which were the withdrawn claims) ..." *Def. Markman Brief p. 6*

The examiner called specifically addressing Claims 1 and 4 which were directed to <u>non-elected species and had been withdrawn from consideration until a generic claim was held allowable</u>. See below excerpt from Exhibit C-1, which was before the district court:

**Disposition of Claims**

☒ Claim(s) *1-21* is/are pending in the application.

Of the above, claim(s) *1-10, 12, and 15* is/are withdrawn from consideration.

Claims 1-10, 12 and 15 were withdrawn from consideration (until a generic claim was held allowable), therefore claims 1 and 4 were withdrawn. Neither Appellee's

misstatement of a material fact, nor the district court's reliance on this misstatement changes this. Thus, this is a manifest error of fact, which has profound implications for the construction of the term "secured to".

**Claims 11 and 21 were Generic**

Plaintiff-Appellant had previously stated to the PTO (on August 21, 1996), in Amendment A that:

> **Claims 11 and 21 are believed to be generic.**

Thus, when the examiner called to discuss the two generic claims (11 and 21) and two of the withdrawn claims (1 and 4), it is consistent with the examiner's statement in the office action (dated July 22, 1996) requiring the election of species:

> Upon the allowance of a generic claim, applicant will be entitled to consideration of claims to additional species which are written in dependent form or otherwise include all the limitations of an allowed generic claim as provided by 37 C.F.R. § 1.141. If claims are added after the election, applicant must indicate which are readable upon the elected species. M.P.E.P. § 809.02(a).

The examiner called to discuss Claims 11 and 21, which Appellant had previously stated were believed to be generic, and gave "consideration to claims to additional species", discussing claims 1 and 4. The examiner required that previously withdrawn Claim 4 be cancelled, since it was not enabled in any of the drawings. See below from the Examiner's record of the phone interview:

Agreement ☒ was reached. ☐ was not reached.

Claim(s) discussed: 1, 4, 11, 21

Identification of prior art discussed: art of record.

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: Some changes were agreed upon to better define the claims over the prior art, and an amendment will be faxed for further consideration.

The examiner's interview summary did not state that claim 4 had to be cancelled, so all of the details of the conversation were not documented, but the next day, Appellant sent an amendment referring to the phone interview, canceling claim 4, as had been discussed, making changes to the other claims as had been discussed with the examiner, and including the claims that had been directed to the non-elected species:

**Sir:**

**In accordance with our phone conversation on 3/5/97, kindly amend the above application as follows:**

...

**4. (CANCELLED)** The backrest/leisure chair of claim 1 wherein said generally wedge shaped foundation has means for supporting armrests through securing the armrests to generally the lower half of the face of the foundation.

...

11 12. **The backrest/leisure chair of claim 11 wherein the top cushion is integral and continuous with the generally wedge shaped foundation.**

This was followed by a Notice of Allowability, stating that "The allowed claim(s) is/are 1-3, 5-22. Thus generic claims 11 and 21 were allowed, as was claim 12, which was renumbered by the examiner as "11", because claim 4 was cancelled. See below:

**NOTICE OF ALLOWABILITY**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☑ This communication is responsive to amendment filed 3/6/97.

☑ The allowed claim(s) is/are 1-3, 5-22.

Shortly thereafter, on May 19, 1997, Plaintiff-Appellant filed an Amendment requesting permission to amend three pages of drawings, one of which was for FIG. 1E – one of the integral and continuous embodiments. See examiner's initials below approving this.

Approved

Sir:

Applicant respectfully requests permission to amend the drawings of the above application after allowance. The proposed changes are indicated on the red photocopies of FIG.s 1A - 1E, or sheets 1-3 thereof attached hereto.

Below is the revision to FIG. 1E, showing the change in red.

The only reasonable inference to be drawn from the examiner's actions on the record, is that he did find claims 11 (later renumbered to 10) and 21 to be generic – as Appellant submitted at the time of the election of species, and he properly allowed the previously withdrawn claims, to include claim 11 which he allowed along with claim 1, and after requiring cancellation of what was claim 4 for lack of

enablement. There would have been no reason for the examiner to call to discuss the generic claims, and require cancellation of a withdrawn claim, if he were not going to allow the other previously withdrawn claims. Further, unlike the case the district court relied upon (dealing with no generic claim being allowed in a grandparent application), in the present case the generic claim was allowed, as were the dependent claims (except claim 4).

**Significance of the Correction -- Claim 11 is Valid**

That the record reflects that the examiner phoned to discuss both the generic claims as well as withdrawn claims, prior to allowance is a critical correction – is so critical that Appellee Contour was willing to misstate a material fact.

Claim 11 is presumed valid, and is to be treated as such unless it is found to be invalid by clear and convincing evidence. Plaintiff Albecker does not have the burden to prove it is valid, it is presumed valid, and the burden is on Defendant to show that it is not valid. Defendant has not done so.

HOWEVER, if claim 11 depends on claim 10, it is axiomatic that claim 10 is broad enough to include embodiments that have a top cushion which is integral and continuous with the foundation. As Contour stated in its reexamination request:

> "Claim 11, which is dependent from claim 10, recites that the 'top cushion is integral and continuous with the generally wedge shaped foundation,' and thus, 'integral and continuous may be included within the scope of the term 'secured' ' ". *Corrected Request for Reexamination* pages 4, 22, 30, 39, 45, 54, 58, 68, 72, 74, 94, 103, 111, and 121

This this Court has set forth rules of fair play:

> "Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." "A patent may not, like a 'nose of wax,'

be twisted one way to avoid anticipation and another to find infringement." (Citations Omitted) *Amazon.com v. Barnes and Noble*, United States Court Of Appeals For The Federal Circuit 239 F.3d 1343; 2001 U.S. App. LEXIS 2163

The Federal Circuit stated in *Schindler,* that claim limitations "are implicitly permitted … by extension" in the independent claims from which they depend:

> "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id.
>
> …
>
> "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." Id. **Claim 7 depends from claim 1** and adds the phrase "wherein the recognition device reads a key having a code." A "key" is disclosed in the specification as a "building key," which is embedded with an information transmitter that is actuated by a recognition device mounted near a "door lock" of a building. '094 patent col.5 ll.30-32. The door lock recognizes the building key when the passenger uses his key to open the door. Id. col.5 ll.32-33. The specification, in describing a variation of this information transmitter "key" embodiment, notes that the recognition device may be mounted near a "timeclock," and an elevator is dispatched when a user clocks in or out of work. Id. col.5 ll.33-35. Because a user would need to use his hands to bring the transmitter key within range of the recognition device to unlock the door, or to clock in or out of work, these types of personal action are implicitly **permitted in claim 7 and, by extension, in claim 1. Thus, the claims appear to permit at least** those types of personal action that are necessary to bring the information transmitter within range of the recognition device. *Schindler Elevator Corporation v. Otis Elevator, Federal Circuit,* 2009-1146, January 15, 2010 p. 10 **(emphasis added)**

Not only does *Schindler* 2010 clearly hold the principle regarding what is "implicitly permitted in claim [dependent claim] and, by extension, in claim [independent claim]. Thus, the claims appear to permit at least …", but more

recently the Federal Circuit held in *Alcon Research v. Apotex*, Decided August 8, 2012 :

> "It is axiomatic that a dependent claim cannot be broader than the claim from which it depends. …. Therefore if claim 2 covers the range … claim 1 must cover at least that range." *Alcon Research v. Apotex,* Federal Circuit 2011-1455, p. 10

Had the district court considered Claim 11 in its claim construction of the term "secured to", it would not have had to strain to look at claims 8 and 10 (18 and 20) claims away having nothing to do with either the top cushion or foundation, to reach a construction requiring an "attachment means" – that excluded every single embodiment disclosed in the '653 patent made with an injection molding process.

Later Defendant-Appellee Contour stated:

> "The "attachment means" portion of this definition does not import a functional limitation or any limitation at all for that matter, because the "attachment means" is intentionally not limiting."
>
> And,
>
> "An interpretation of "secured to" as "attached to" (without the "attachment means" language) is an acceptable construction that does not substantively alter the scope of "secured to" or change the Court's interpretation of the entirety of limitation ( c ). *Def. Response to Motion to Reconsider* p. 3-4

After dealing with the issue of the special definition, Appellant Albecker will show that dependent claim 11 AND the special definition make it clear that the term "secured to", as used in the '653 patent, includes parts which are integral and continuous.

**Special Definition**

The second manifest error that the district court made deals with the special definition for the integral and continuous top cushion in FIG. 1E of the '653 patent. Appellant would submit that the question for review is:

> *Is there anything that indicates that the special definition applies only to the integral and continuous embodiments?*

There is a second manifest error in the district court's decision, regarding the significance of the special definition in the specification. The special definition has two parts, referred to FIG. 1E, and stated as follows:

> "For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion 26s, and though it may be technically the same material, it is considered as a foundation with a top cushion." '653 Patent p. 10, lines 8-12

The first district judge adopted the Plaintiff-Appellant's proposed definition that it acknowledged incorporated the special definition for the top cushion:

> Plaintiff argues that he gave the term "top cushion" a special meaning that supports his proposed construction of limitation (c). (*Id.*) Indeed, the specification for the '653 Patent does provide a special meaning for the term "top cushion." '653 Patent col. 10, ll. 8-12 ("For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion and though it may be technically the same material, it is considered as a foundation with a top cushion."). Where an inventor has given a term a special meaning, the Federal Circuit has held that the "inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Defendant does not provide any argument grounded in the intrinsic record in opposition to Plaintiff's proposed construction of the term "top cushion." (*See* R. 47, Def.'s Mem.) Thus, the Court adopts the following construction for the term "top cushion" proposed by Plaintiff: "the top 4" of material on the face of the foundation or the cushioning material on 'the face of the foundation.'" (R. 45, Pl.'s Mem. at 4.)

The second district court judge stated:

> "Despite the definition's location in the specification, nothing in the definition suggests that it only applies to claims reading on that embodiment and not to claim 10." (emphasis added) *Order* September 27, 2013 p. 7

This is critical, as the district court later compared the construed claims to the Accused embodiment, and it was critical that the special definition adopted in the construed claims be correctly applied. Though the special definition clearly applies to claim 10, it does so only with respect to embodiments which have an integral and continuous top cushion 26s. Plaintiff has always maintained that Claim 10 is generic, and thus readable on all of the embodiments, including all three major species shown in FIG.s 1A, 1E, and 2A. Thus, district courts adoption

of the two-part ( top 4" … or the cushioning material on the face of the foundation) construed term scope covers both integral and continuous top cushions (the top 4" inches) as well as overlying cushions (which may or may not be 4").

The Court however, misapprehended the limitation of the special definition portion of the construction, stating:

> "but Albecker's definition of "top cushion" is not explicitly limited to an embodiment consisting of a foundation with an integral and continuous top cushion."

But, three sentences later, the district court appears to contradict itself:

> And more importantly, Albecker qualified his definition with this clause: "and though it may technically [sic] the same material, it is considered as a *foundation* with a top cushion. " *Id.* col. 10 ll. 10-12 (emphasis added). By taking pains to point out that this particular embodiment still has a foundation and a top cushion *although* the pieces are made of the same material, Albecker himself suggests that in the other embodiments the top cushion and foundation are normally *not* made of the same material, and instead must be secured to each other with a means of physical attachment. Order September 27, 2013, p. 7-8

Appellant Albecker would submit that "it" cannot reasonably refer to embodiments that are integral and continuous, if Appellant was also suggesting "that in the other embodiments the top cushion and foundation are normally *not* made of the same material."

Plaintiff-Appellant would submit that the district court erred by straining to see the special definition in a way that would harmonize with its perceptions, when the more reasonable interpretation is that it points the other way.

The *special definition* is directed to a top cushion that is integral and continuous with the foundation, and *only* to a cushion that is integral and continuous with a foundation. In the *special definition,* "the top cushion" is not just any top cushion – it is explicitly "the top cushion **26s**".

> "For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion 26s, and though it is may technically be the same material, it is considered as a foundation with a top cushion." '653 Patent p. 10, lines 8-12

26s is explicitly defined 4 sentences above the special definition in the '653 patent as:

> "In the drawing, 42s is a foundation that has an integral and continuous top cushion 26s made of the same type of material as the foundation." (emphasis added)

See the illustrations of FIG.s 1A and 1E above. 26**s** does not appear anywhere else in the specification (other than for FIG. 1E) – it is exclusively the integral and continuous top cushion (see FIG. 1E), and 26s is part of the special definition. The normal overlaid top cushion is explicitly defined as 26 (see FIG. 1A above),

without the "s" (and shown with a solid line – as opposed to the dashed line for the integral and continuous top cushion 26s). Thus, the district court's construction, which the district court directly acknowledged was a *special definition* with Albecker as lexicographer, is clearly meant to read on and only on an integral and continuous top cushion 26s made of the same type of material as the foundation.

Thus, in the construction the district court adopted, the district court recognized that the top cushion can be integral and continuous with the foundation.

**Significance of Special Definition:**

Though it seemed contradictory with its statement that the special definition was not limited to the integral and continuous embodiments, the district court seemed to recognize that the special definition did not cover "other embodiments":

> "By taking pains to point out that this particular embodiment still has a foundation and a top cushion *although* the pieces are made of the same material, Albecker himself suggests that in the other embodiments the top cushion and foundation are normally *not* made of the same material, and instead must be secured to each other with a means of physical attachment." *September 27 Decision p. 7-8*

Thus if the district court says that embodiments not made of the same material "must be secured to each other with a means of physical attachment" then for the purposes of the claims that is how the integral and continuous foundation with top cushion is understood. This is the essence of a special definition. If the district court finds that a "foundation with a top cushion" has to have any characteristic, then *for the purposes of the claims*, the integral and continuous top cushion has that

characteristic. Thus, from an *apparatus* claim standpoint, the lexicographer agrees, that the two integral and continuous pieces *are* secured with a means of physical attachment (as they are considered as a foundation with a top cushion). There is no concern as to how they are made. Albecker is only the lexicographer of the apparatus, not the process.

Thus, under the special definition, even if there were no dependent claim 11 confirming the scope of "secured to", embodiments with an integral and continuous top cushion 26s would be "For the purposes of the claims ... considered as a foundation with a top cushion", with whatever limitations a "foundation with a top cushion" might be required to have.

**3. Did the trial court apply the wrong law? _____Yes _____No If so, what law should be applied?** (from CAFC Form 12)

A: **YES**

**District Court Erred by Acting as the Finder of Fact**

**Background:** Plaintiff believes that some background is in order to aid in understanding the situation. When the first judge made its ruling (May 3, 2010), the district court adopted Plaintiff's construction for top cushion (including "the top 4" taken from the special definition) and Defendant's construction for "secured to" (attached using attachment means ...). Plaintiff-Appellant moved the district court to reconsider, noting that the construction would rule out every single

disclosed embodiment in the '653 patent made with an injection molding process (as disclosed in the patent). Defendant responded saying:

> "The "attachment means" portion of this definition does not import a functional limitation or any limitation at all for that matter, because the "attachment means" is intentionally not limiting." *Def. Response to Motion to Reconsider* p. 3-4

After the district court handed down its September 27th 2013 order, Appellee Contour approached Albecker to seek a stipulation that the order prevented a ruling of non-infringement. Plaintiff, who was caught off guard, was inclined to agree, and after reading the proposed language, suggested it might be acceptable if the stipulated order stated that the reason the accused product did not infringe – i.e. it did not have an attachment means, as required by the district courts construction. Contour found the suggestion very unacceptable. In reading the district court's September 27th Order, it is clear that the district court was still defending the "attachment means" as the critical requirement. But, also stated that "the Court's construction of 'secured to'—which requires the use of physical attachment means—does not rule out production methods." Order p. 6

Appellant put together the following patent infringement chart, showing that all of the elements in the construed claims were present in in the Accused product:

**<u>Patent Infringement Chart</u>**

(Comparison of Claims/Construed Claims and Accused Product)

| 10. A backrest/leisure chair comprising: | |
|---|---|

| | |
|---|---|
| (a) a relatively firm generally wedge shaped foundation having a face, a base, a back and two generally triangular sides, with the base being positioned parallel to a horizontal plane such as a floor or bed, and the face being oriented at an acute angle relative to both the base and the horizontal plane to define a generally wedge shape, wherein said face has an upper portion and a lower portion, |   Note: The three aspects can be inferred from the actual photos below. |
| wherein said upper portion has an average general pitch relative to the horizontal plane and said lower portion has an average general pitch relative to the horizontal plane, and wherein said face further has a contour which orients the average general pitch of upper portion of the face at a greater incline than the average general pitch of the lower portion; |   Note angle C. ALP and AUP, are explicitly defined in specification. |
| (b) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and |   Note: Side profile of Lumbar Support confirms it is a convex generally semi-elliptically shaped elongated cylinder. See Defendant's photo below with spine to confirm it has sufficient firmness to maintain shape for lumbar support. |
| (c) a top cushion having an upper and lower portion secured to the face of the generally wedge shaped foundation. |   In accordance with special definition adopted by the Court, the top cushion is "top 4" ..." |

| | |
|---|---|
| 1. "Top cushion" refers to "the top 4" of material on the face of the foundation or the cushioning material on the face of the foundation." Claim Constr. Order at 13.<br>2. "Secured to" means "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." *Id.*<br>3. "Face of the generally wedged shaped foundation" is "the top surface of the wedge shaped foundation." *Id.* at 14.<br><br>11. The backrest/leisure chair of claim 10 wherein the top cushion is integral and continuous with the generally wedge shaped foundation. | <br><br>Note: The top cushion 26s is adhesively attached to the foundation 46s with polyurethane foam. And as provided in Claim 11, the top cushion is integral and continuous with the foundation. Further, as shown below, the top cushion 26s and foundation 46s are further secured with a tensioned zippered fabric/upholstery cover. |
| 12. The backrest/leisure chair of claim 10 wherein the firm foundation has an ILD firmness of at least 30 pounds.<br><br>13. The backrest/leisure chair of claim 10 wherein the top cushion has an ILD firmness of less than 41 pounds.<br><br>16. The backrest/leisure chair of claim 10 wherein the generally midpoint on the face has a means for cradling the middle range of the occupant's thoracic vertebrae.<br><br>17. The backrest/leisure chair of claim 10, wherein an obtuse angle is formed by the intersection of the average general pitch of the lower portion and the average general pitch of the upper portion, and wherein said obtuse angle is between about 160 degrees and 170 degrees. | <br><br>Note: Though there has not been discovery on the specific specifications, based on an examination of the product, the foam falls within the ILD parameters, and as shown above, the means for cradling the thoracic curve is present (Cb and also note spine on backrest, and also note angle C). |
| | |

| 18. The backrest/leisure chair of claim 10 further including a seat cushion having an attachment means secured to the lower portion of the foundation, suitable for providing comfort to the buttocks when sitting on the floor, and at the same time preventing the occupant of said leisure chair from slipping down out of position.<br><br>20. The backrest/leisure chair of claim 10 wherein a pillow is provided for a head rest, and wherein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation. | Accused Product<br><br>Figure 2F<br>From '653 Patent<br><br>Note: Both pillow and seat cushions are present in the Accused Product, compare with patent drawing 2F. |
|---|---|
| | |

If, as the district court stated, its construction "does not rule out production methods." methods of production, and further in view of Contour's statement made to preserve its construction that "'attachment means' is intentionally not limiting", there should have been no problem. But, the district court effectively changed the construction on the JMOL order, requiring that "Claim 10 is satisfied only by the physical attachment of *two separate pieces* with attachment means."

Thus, the "attachment means" limitation (which is "not limiting at all" and "does not rule out production methods" requires "two separate pieces".

**"attachment means" *is* integral and continuous and "attached to"**

This is especially interesting, since "attached to" and "attachment means" as used in the '653 patent includes parts that are integral and continuous – especially the

very parts that the district court's construction of "attached using attachment means" was largely based on -- the seat cushion 34 "attachment means" 35.[1] The "attachment means" 35 in the elected species is clearly integral and continuous with the seat cushion 34 (see FIG. 1B below). Though fully described in the '653 patent, it is illustrated better in FIG. 1E below, from the continuation in-part-patent patent, which became US Patent Number 6,155,647. See below FIG. 6B which is exactly the same as FIG 1B in the '653 patent.

The description for 1B states in the '653 patent at issue presently states:

> "In a similar manner, the seat cushion 34 could be put into upholstery material 30 that has been sewn together somewhat like a pillowcase or an open bag. After filling the upholstery 30 with the seat cushion 34, the open portion could be stitched closed, but **in a manner that leaves the flap shown as the attachment means 35**." '653 Patent p. 8 lines 46-52

This same process (for FIG. 5) is also described as:

> ... the upholstery bag would have about **6" of material extending at the open end beyond the cushion**, for attaching to the foundation or frame of a

[1] The district court's claim construction ruling referred to the claims and descriptions of both the seat cushion and pillow, each of which included "attachment means". Nothing else in the claims referred to "attachment means".

legless leisure chair. This type of construction could be simpler than attaching straps, as well as somewhat **more secure**. '653 Patent p. 15 lines 9-19

Thus, "leaves the flap" or " 6" of material extending at the open end" does not suggest that "separate" pieces are needed to attach the "attachment means".

**"attached to"**

The '653 specification further refers to the seat cushion being "attached to" the integral and continuous attachment means 35:

> "Of course to do this, the top cushion 34a[2] would have to be **attached to** the attachment means 35." '653 Patent p. 9 lines 47-49

Since the "attachment means 35" is integral and continuous with the seat cushion, "attached to" refers to extending or leaving a flap (that is integral and continuous with the seat cushion). See illustration 1D below that the specification refers to:

Figure 1D

[2] Additionally, it should be noted that "seat cushion 34" in the '653 patent typically refers to both the filling and the upholstery together: "In a preferred embodiment, the seat cushion 34 is filled with a firmer material than the top cushion 26." '653 Patent p. 7 lines 39-41

The specification was explaining how the seat cushion/legrest can be made to have the legrest flip out from the bottom cushion – thus the instead of 34b (the bottom cushion) being the seat cushion, 34a would become the seat cushion. Thus, the integral and continuous flap[3] would have to be "attached to" (extended from) 34a with the same process as for 34b. Thus, in this instance, "attached to" clearly does not refer to "separate pieces", but to two pieces that are integral and continuous.

Note the similarity with dashed lines between the integral and continuous flap (5f) ("attachment means") and seat cushion (4) illustrated in the '647 patent (shown on left) and integral and continuous top cushion (26s) and foundation (46s) shown in the '653 patent (shown on right). And not only is it "attached", it is described as "This type of construction could be simpler than attaching straps, as well as somewhat more **secure**." '653 Patent p. 15 lines 17-19

A reasonable jury might find that on the accused product, the top 4" is "attached to" the foundation (the way the Federal Circuit in *Toro I* referred to two pieces that were integral and continuous: "this restriction ring (76) is **attached to**

[3] Note: Seat cushion straps were only shown in the embodiments for Fig.s 2 in the '653 patent.

the air inlet cover"), it feels like it is attached, in fact might even be "more secure" than a piece made up of "separate pieces", and the jury might reasonably conclude that the top 4" and foundation are held together with some "means of physical attachment" which is integral and continuous -- as disclosed for the seat cushion in the '653 specification. Based on the above, the Plaintiff would request that the District court allow the jury to make the determination as to whether the District court's construction of "secured to" requires "separate" pieces or integral and continuous pieces -- as in the seat cushion and attachment means in the '653 specification.

**<u>Discussion</u> – Court Made a Finding of Fact**

Under patent law, after *Markman*, the district court is to construe the claims as a matter of law, and permit the jury to compare the construed claims to accused product. In this case, whether or not the top 4" on the face of the foundation … wherein the top cushion is integral and continuous with the foundation" is satisfied by the limitation "separate", is properly within the province of the jury. The District court construed the claims, and valid Claim 11 explicitly provides for the top cushion to be integral and continuous with the foundation. Further, Defendant said that "'attachment means' is intentionally not limiting". Similarly dealing with the issue of "separate" and "integral", the Federal Circuit held that the District court "invaded the province of the jury":

"We, however, take issue with the district court's conclusion, on cross-motions for summary judgment, that the accused Graco juvenile car seat cannot infringe as a matter of law because it lacks a seat **separate** from a base and, at most, includes a base that is **integral** to the seat. See Nazomi Communications, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1367 (Fed. Cir. 2005) ("A summary judgment motion is proper if there are no genuine issues of material fact, while viewing the facts in a light most favorable to the non-moving party."). **The district court has invaded the province of the finder of fact, here a jury requested by Dorel, in deciding the infringement question**. *Dorel Juvenile Group Inc. v. Graco Children's Products Inc.*, Federal Circuit, 05-1026, November 7, 2005. (**emphasis added**)

Also see:

*Collins v. Signetics Corp.*, 605 F.2d 110, 115 (3d Cir. 1979) ("Neither a trial nor an appellate court has the authority to substitute its judgment for that of the jury and thus usurp the jury's function as the principal finder of fact.").

Plaintif has requested a trial by jury, and is entitled to have the factual determination of the application of the construed claims determined by a jury. In this case, the infringement should not be about whether or not the top 4" was "separate", but whether they are attached with a means of physical attachment so that they are integral and continuous, as provided by valid Claim 11. How the limitations set forth in the district court's actual construed claims are satisfied – i.e. whether or not the limitation of the "top 4"" is satisfied only by a cushion that was "separate" -- or does not need to be separate at all -- is a question for the finder of fact. The finder of fact determines what limitations do or do not satisfy the limitations in the construed claims set forth in the infringement chart.

**4. Did the trial court fail to consider important grounds for relief?**
**_____Yes _____No If so,**
**what grounds?**
**Yes**

**District Court Gave Little or No Weight to Meaning of Terms in the Art**

The district court seems to have given little or no weight to the fact that record showed that Appellee Contour's CEO, who is presumably a person having ordinary skill in the art (as he claims to be the inventor of the accused product). The record before the district court showed that Appellee's CEO patent application, involving the same law firm for a portable support cushion which with parts that were integral and continuous, is referred to in the very same way "attached to" "securing", and claimed in an almost identical manner – with an independent claim that covers both integral and continuous as well as attachment involving two parts. Please see Exhibit D and comparison below.

| '653 Patent | Davis Patent Appn. 11/399,739 |
|---|---|
| 10. A backrest/leisure chair comprising:<br>(a) a relatively firm generally wedge shaped foundation …; and<br>(c) a top cushion having an upper and lower portion<br>secured to the face of the generally wedge shaped | 1. A body support cushion, comprising:<br>A body contacting section;<br>A support section;<br>A hinge connecting the body contacting section and the support |

| | |
|---|---|
| foundation. | section … |
| 11. The backrest/leisure chair of claim 10 wherein the top cushion is integral and continuous with the generally wedge shaped foundation. | 2. The body support cushion of Claim 1 wherein the body contacting section, the support section and the hinge are formed as a single member.<br><br>12. The support cushion of Claim 1 wherein the body contacting section, support section, hinge and coupling means are integrally formed of a single sheet of material. |
| | *See Also:*<br><br>57. The support cushion of Claim 56 wherein the supporting section, base section and hinge are formed as a single piece. |

Obviously this suggests that terms such as "secured to" or "connecting" include "integrally formed of a single sheet of material". What is even more amazing is that they were subject to a restriction requirement, with 9 species (just like the '653 patent) and the same Moore Van Allen attorney who has been working on the present infringement case since the beginning (and who wrote the reexamination request for the '653 patent) elected 1 species, and then stated:

"Applicant submits … that Claims 1, 32, and 56 are generic."

If the PTO examiner agreed those claims were generic, they could not file a divisional application – and according to Defendant's representations to this District court, that would mean that they just disclaimed those embodiments. However, they knew better and wasted everyone's time in the present case. And another shocker, in Defendant's patent application specification, the integral and continuous body contacting section and support section are described as "attached to" with a living hinge. They were never separate, and all three parts, including the hinge are formed as a single member.

**Factual Background – '653 Patent**

Plaintiff-Appellant's '653 patent had three types of top cushions, on each least two types of embodiments each. Each one also had a dependent claim to cover the type of cushion, and the integral and continuous top cushion also had a special definition that was adopted by the first district judge. As shown above, this is no different than how Appellee with the same legal team did it for their patent application referred to above. See exhibit below.



TOP CUSHION
Figure 1E
Figure 3A
Figure 1B
Figure 4C
Figure 3B
Figure 4A
11.The backrest/leisure chair of claim 10 wherein the top cushion is integral and continuous with the generally wedge shaped foundation.
14.The backrest/leisure chair of claim 10 wherein said means for supporting a natural lumbar lordotic curve is a relatively firm generally semi-elliptically shaped cylindrical contour on the foundation, with the softer top cushion having a hollow that corresponds to the semi-elliptically shaped contour, placed over the foundation.
15. The backrest/leisure chair of claim 10 wherein said generally wedge shaped foundation has a convex contour on the lower portion of said face for supporting the lumbar curve of the user in a relatively natural lordotic curve, when a top cushion of is placed over it, and wherein the top cushion generally follows the convex contour of the foundation.

## Conclusion

Plaintiff-Appellant Albecker requests that this Court recognize that the PTO examiner found the generic claims allowable, and then allowed the other claims (except claim 4), that the special definition (the top 4") is exclusively directed to the integral and continuous top cushion 26s , that the evidence of record showed that the meaning in the art of "secured" and "attached" includes integral and continuous ("formed as one piece"), that the factual determination of infringement

should be made by the jury, especially in view of the terms "attached" and "attachment means" as used in the patent, and that all of the factors on the overview table shown on page 2 point toward a broad construction of the term secured to – that includes both integral and continuous as well as products made of two pieces. Accordingly, Plaintiff-Appellant requests for a corrected claim construction, and a remand to be considered by the jury.

Respectfully submitted,

By: ______________________

Walter Albecker, Pro Se
1137 W. Taylor No. 326.
Chicago, Illinois 60607
800-975-7005 ext. 4 Voice
800-975-7004 Fax
walbec1@hotmail.com

## CERTIFICATE OF SERVICE

I, Walter Albecker, pro se, hereby certify that a copy of the foregoing

***PRO SE* BRIEF** OF PLAINTIFF-APPELLANT WALTER ALBECKER

to be served via US Mail to:

J. Mark Wilson
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003

(704) 331-1177 Phone
(704) 339-5981 (fax)

On the 20the Day of March 2014.

Walter Albecker

*Pro Se*

2014-1318

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

WALTER ALBECKER,
Plaintiff-Appellant,
v.

CONTOUR PRODUCTS INC. (FL),
Defendant-Appellee.

---

# APPENDIX TO *PRO SE BRIEF*

**Exhibit A - US Patent No. 5,836,653** (Pursuant to *CAFC LR* 28 (A) (12))

**Exhibit B Judgment and Opinions of Trial Court**

B-1 ... Minute entry of Judge E. Chang, January 21, 2014
B-2 ... JMOL and Judgment, January 6, 2014
B-3 ... Ruling on Motion to Reconsider, September 27, 2013
B-4 ... Initial Claim Construction Ruling, May 3, 2010

**Exhibit C Excerpts from Prosecution History**

C-1 ... PTO Office Action identifying withdrawn claims.
C-2 ... PTO Examiner's Interview Summary.
C-3 ... Changes to Specification Fig. 1E.
C-4 ... Changes to FIG 1E.
C-5 ... Amendment initialed by Examiner, accepting changes to FIG. 1E.

**Exhibit D Excerpts from Davis' US Patent Appn. No. 11/399,739**

D-1 ... Cover Page.
D-2 ... Specification referring to "securing".
D-3 ... Specification referring to "attached to".
D-4 ... Amendment to PTO referring to "generic" claims.

# Exhibit – A

US Patent No. 5,836,653  (Pursuant to *CAFC LR* 28 (A) (12))



US005836653A

# United States Patent [19]

**Albecker**

[11] **Patent Number: 5,836,653**

[45] **Date of Patent: Nov. 17, 1998**

[54] **BACKRESTS/LEGLESS LEISURE CHAIRS MADE WITH A FOUNDATION**

[76] Inventor: **Walter J. Albecker**, 838 S. May, Chicago, Ill. 60607

[21] Appl. No.: **492,170**

[22] Filed: **Jun. 19, 1995**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 899,750, Jun. 17, 1992, Pat. No. 5,425,567, and Ser. No. 721,179, Jun. 26, 1991, abandoned.

[51] **Int. Cl.**[6] .......... **A47C 20/00**

[52] **U.S. Cl.** .......... **297/452.31**; 297/452.16; 297/452.32; 5/632; 5/633

[58] **Field of Search** .......... 297/452.1, 452.16, 297/452.31, 452.32; 5/630, 632, 633, 653

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 167,666 | 9/1952 | Argento | 5/633 X |
| 2,281,629 | 5/1942 | Snow | 297/456.17 X |
| 3,009,172 | 11/1961 | Eidam | 5/632 |
| 3,555,502 | 1/1971 | Radford | 5/632 |
| 3,680,917 | 8/1972 | Harris | 5/633 X |
| 4,171,549 | 10/1979 | Morrell et al. | 5/632 |
| 4,627,423 | 12/1986 | Kampner | 5/633 X |
| 4,635,306 | 1/1987 | Willey | 5/632 |
| 5,432,967 | 7/1995 | Raftery | 5/633 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1023403 | 12/1977 | Canada | 5/633 |

*Primary Examiner*—Peter R. Brown

[57] **ABSTRACT**

A number of generally wedge shaped backrests and legless leisure chairs for sitting on the floor or on a bed, which orient the user's upper back at a higher angle than the user's lower back. These are ideally suited for people who want to be in a reclining type position, but yet want to do something like watch television. The backrests/leisure chairs disclosed use a support foundation (**42** and **46**). The backrests/leisure chairs described also have a way of maintaining the lumbar region of the user's back in a relatively natural lordotic curve, some through a high firmness lumbar support member (**28**) on the support foundation (**42** and **46**) placed in a hollow in the back of the main cushion (**26**), and others through making a convex contour on the lower portion of the backrest/leisure chair. All of the leisure chairs for sitting on the floor have a seat cushion (**34**) to prevent the user from slipping down out of place and these chairs can also have a pillow (**32**) for a headrest. Also disclosed are a number of seat cushion and legrest alternatives (**34**) for the leisure chairs including folding seat cushions and a two piece seat and legrest cushion system.

**21 Claims, 13 Drawing Sheets**



Figure 1A

Figure 1B



**Figure 1C**



**Figure 1D**

Figure 1E

Figure 2A

Figure 2B

Figure 2C

Figure 2D



Figure 2E
U.P.
32
26
34a
L.P.
42
34b

Figure 2F
U.P.
32
26
34a
36
L.P.
42
34b

Figure 3A

Figure 3B

Figure 3C

U.S. Patent Nov. 17, 1998 Sheet 12 of 13 5,836,653

Figure 4A
U.P.
48
L.P.
46
43
U.P.
Cb
Figure 4B
L.P.
30
U.P.
48
Figure 4C
L.P.

**Figure 5**

26
34a
34b
42

## BACKRESTS/LEGLESS LEISURE CHAIRS MADE WITH A FOUNDATION

### CROSS REFERENCE TO RELATED APPLICATION

This invention is a continuation-in-part and includes elements described in application Ser. No. 07/899,750, filed Jun. 17, 1992, now U.S. Pat. No. 5,425,567, granted Jun. 20, 1995, entitled: BACKRESTS/LEGLESS LEISURE CHAIRS AND METHODS FOR MAKING CUSHIONS, and also application Ser. No. 07/721,179, filed Jun. 26, 1991 later abandoned and continued as application Ser. No. 08/197,223, filed Feb. 16, 1994, now U.S. Pat. No. 5,474,362, granted Dec. 12, 1995. Both of these patents are incorporated by reference herein, in their entirety.

### BACKGROUND

1. Field of the Invention

This invention relates to furniture, and specifically to legless leisure chairs or backrests that are appropriate for use on a floor or on a bed.

### BACKGROUND

2. Discussion of Prior Art

For years, people have appreciated chairs and backrests which enable them to be in a position which is somewhere between sitting up straight and lying down. There are now many types of reclining chairs and lounges on the market. Most of these are large and expensive, and also cannot be used for sitting on the floor or on a bed. Many people, including the present inventor enjoy reclining on a bed, or close to the floor. To satisfy this need, a number of inventions have been developed.

U.S. Pat. No. 2,593,319 to Levitin et al discloses a foldable furniture unit for reclining on the floor. Levitin's invention is interesting, but the portion of the back support for the lower back is concave which would tend to be uncomfortable for most people—because it works against a natural lordotic curve. Also, it requires a fair amount of floor space when used as a recliner, making it necessary for many people to fold it up after each use.

U.S. Pat. No. Design 167,666 to Argento discloses a "televiewing floor rest" which is in a generally wedge shape. Though no description of the internal construction of the chair is given, there is nothing to indicate that there is a provision for substantial lumbar support. Additionally, when the chair is in the reclined position, the viewer would probably be looking at the ceiling.

The combined ottoman and collapsible backrest in U.S. Pat. No. 2,966,205 to Blaschko lacks a specific lumbar support, is not suitable for use on a bed, similar to the Ezekoye support in reclining position mentioned below, it does not orient the user's upper back and head to comfortably view a television placed at a normal height, does not seem to provide an effective means to keep the user from slipping down, takes up a lot of floor space when in the backrest position, which may necessitate folding and unfolding for each use, and has the limitations of a backrest that is combined with an ottoman.

The therapeutic device disclosed in U.S. Pat. No. 3,555,582 to Radford provides a wedge with a contour to provide additional support to portions of a user's body. The therapeutic device is designed to be used in a sofa or bed, and appears to be for orienting the head, neck and upper back in a position suitable for watching television or reading. This invention does not appear to do anything for the lower back.

U.S. Pat. No. 3,995,335 to Neely discloses a backrest made of a number of pillows attached to a frame, designed to enable invalids to sit up in bed. Neely's invention is bulky and clumsy, and though it may be very functional as a pillow for invalids, it is probably not best suited as a leisure chair for general use.

U.S. Pat. No. 4,064,580 to Ezekoye shows a multi-position back support; however it does not provide a means of preventing a user from slipping down, does not provide any lumbar support, doesn't have a cushion for the user's buttocks, and in the reclining position, the user basically is looking up at the ceiling..

The cushion ensemble and method of arranging cushions disclosed in U.S. Pat. No. 4,171,549 to Morrell and Gray provide a chair or lounge. The cushion ensemble appears simple and economical to manufacture, but it does not provide a clearly articulated lumbar support, is somewhat bulky and clumsy, probably requires rearrangement after each use, would be very casual if considered furniture, and probably is not very effective at preventing the user from slipping down since the seat cushion is not attached.

Canadian Patent No. 1,023,483 to Kohn discloses a bed cushion support having a provision for a small of the back support protruding from the lower center portion as well as an angle between the upper portion and lower portion. The protrusion for the small of the back support would make the backrest difficult to upholster, and might put an undue amount of pressure on the spine of an occupant. Note that the protrusion is primarily supporting only the spine the point of the small of the back. The present invention supports the spine in the lumbar region as well as the body areas near the spine to better distribute the weight or pressure.

U.S. Pat. No. 4,410,214 to Geschwender discloses a leisure chair which can be used in a generally upright position or in a reclining position. Although it is simple and compact, it does not provide a lumbar support, and because the back support is straight, the user has two choices, sit up straight, or recline generally facing the ceiling. There is also no headrest when the chair is in the upright position, and there is also no seat cushion when the leisure chair is used in the reclining position.

The multi-sectional backrest and pillow having the capability of assuming a series of different configurations in U.S. Pat. No. 4,970,742 to Keener does not provide a way to enable the lower back to be at a very low angle which can be very comfortable, while at the same time positioning the upper back and head in such a way that the head can watch a television comfortably when the television is at a standard height. Additionally, the backrest does not seem to provide a clearly articulated lumbar support.

Other inventions which may relate to this field include the floor rocker or video rocker sold in a number of department stores, the adjustable body positioner disclosed by Walpin in U.S. Pat. No. 4,853,993, reclining chairs like La-Z-Boy, the "Wink" chair by Kita, a lounger made by Vuokko designed by Antti Nurmesniemi from Finland, a variety of other chairs which sit close to the ground, and a variety of cushioned backrests for use in bed commonly seen in department stores.

All of the backrests/legless leisure chairs heretofore known to the present inventor suffer from one or more of the following disadvantages:

(a) They do not provide a way for the user's lower back to be very comfortable and relaxed at a low angle, while the user's shoulders and head are at an angle that can be comfortable and well suited for reading and watching television.

(b) A specific lumbar support is not provided for greater comfort and to maintain the natural lumbar lordotic curve.

(c) The design is not suited for use as a regular piece of furniture in a home, such as in a recreation room.

(d) The design is relatively expensive to produce.

(e) The design is not compact and/or relatively portable.

(f) The design does not provide for use in a reclined as well as a more upright position.

(g) The design does not provide an effective means for preventing a person from slipping down, out of the preferred position.

(h) The design does not provide for a good portion of the user's weight to be distributed over a fairly large portion of the chair, instead of being concentrated at the seat.

(i) The design does not provide for a seat cushion that substantially cushions the users buttocks, helps prevent the user from slipping down, and can also be used to enable the user to easily change position from leaning against the backrest to sitting upright without leaning against it.

## OBJECTS AND ADVANTAGES OF INVENTION

Accordingly, several objects and advantages of the present invention are:

(a) To provide leisure chairs/backrests that enable the user's lower back to be at a low angle which can be very relaxing and comfortable, while at the same time positioning the user's upper back and head in a way that is suitable for reading or for watching television when the television is at a standard height.

(b) To provide leisure chairs/backrests that give good support for the user's lower back, especially the lumbar region. Good lumbar support is especially important in reclining type leisure chairs/backrests, because gravity tends to flatten the natural lordotic curve of the lumbar region in the users back.

(c) To provide leisure chairs/backrests that are attractive, appropriate for use as a regular piece of furniture in a home, and can be made to suit a variety of tastes, largely depending on the upholstery fabric chosen. And the design can be adapted for use in a living room, recreation room, or for outdoor use.

(d) To provide leisure chairs/backrests that can be relatively simple and inexpensive to manufacture.

(e) To provide leisure chairs/backrests that provide efficient use of space. Many chairs, such as the Chaise Lounges which provide some of the same benefits as this chair take up a lot of floor space in a home—especially when not in use.

(f) To provide leisure chairs/backrests that could be made fixed or dual position to suit a number of people for a number of purposes. This could enable users to be in either a reclining position, or a more upright position. Such a feature would provide for greater individual comfort and usefulness.

(g) To provide backrests that can be used on a bed or a sofa.

(h) To provide legless leisure chairs that can be used on the floor. Many people enjoy sitting close to the floor. There are a number of other countries where sitting close to the floor is the main way people sit in homes. In America, many people enjoy sitting close to the floor for reading, to be in front of a fireplace, or while watching television. Since most televisions are only a couple feet above the floor level, this provides leisure chairs near the floor with a line of sight advantage over traditional height chairs, enabling people to look at television at about eye level instead of looking down on the television. This enables the user to recline further while still being able to see the television.

(i) To provide leisure chairs/backrests that are substantial, secure, and well made.

(j) To provide leisure chairs/backrests that will tend to keep the user in the right position, by preventing the user from slipping down to a less than desirable position.

(k) To provide leisure chairs/backrests that distribute the user's weight to the backrest as well as to the seat area, for greater comfort.

(l) To provide leisure chairs/backrests that can be used with an adapted work surface to be useful for doing work on a computer or desk top surface while in a reclined position.

(m) To provide leisure chairs/backrests that are ideal for people who are tired at the end of the day.

(n) To provide backrests for beds and sofas that enable the user to get comfortable in a way that is simple and convenient, instead of having to move a number of pillows and/or cushions around in an awkward way that often gives unsatisfactory results.

(o) To provide leisure chairs with a seat cushion that cushions the user's buttocks, helps prevent the user from slipping down, and is appropriate for sitting up in a regular floor sitting position. The latter will enable a user to change from the position of leaning against the backrest to an upright sitting position without leaning against the backrest. Since it is usually uncomfortable to sit in one position for a long time, this makes it possible and convenient to change positions when desired.

Further objects and advantages of my invention will become apparent from a consideration of drawings and ensuing descriptions of it.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, closely related figures have the same number, but different alphabetic suffixes.

FIG. 1A a side view of an embodiment of the present invention having a contoured top cushion and foundation to provide a lumbar support.

FIG 1B s a side view of the embodiment shown in FIG. 1A, but shown with upholstery.

FIG. 1C is a side view of the embodiment shown in FIGS. 1A and 1B, but shown in phantom lines to show how the average general pitch of the lower portion of the chair is at a lower angle relative to a horizontal plane than the upper portion.

FIG. 1D is a side view of the embodiment shown in FIGS. 1A and 1B, but shown with an alternative seat cushion system.

FIG. 1E is a side view of an embodiment similar to the ones shown in FIGS. 1A–1D, but shown with the foundation and top cushion made out of the same material.

FIG. 2A is an isometric view of an embodiment of the present invention hang generally flat surfaces on the upper and lower portions of the top cushion, and using a support

foundation made of a high firmness polyurethane foam, a styrofoam or a similar material. In this view, the main cushion is shown clear to show the support foundation.

FIG. 2B is an isometric view of the embodiment shown in FIG. 2A but showing the main cushion normally.

FIG. 2C is anisometric view of the embodiment shown in FIGS. 2A and 2B with a cutaway showing the support foundation, main cushion, and upholstery.

FIG. 2D is an isometric view of the embodiment shown in FIGS. 2A, 2B, and 2C with upholstery.

FIG. 2E is a side view of the embodiment shown in FIGS. 2A–2D, but with an alternative seat system.

FIG. 2F is a side view of the embodiment shown in FIG. 2E, but with the alternative seat system in the extended position.

FIG. 3A is an isometric view of an embodiment using a high firmness support foundation for use in a bed or sofa. In this view the main cushion is shown clear to show the support foundation.

FIG. 3B is an isometric view of the embodiment shown in FIG. 3A with a cutaway showing the foundation and the main cushion.

FIG. 3C is an isometric view of the embodiment shown in FIGS. 3A and 3B with support foundation, main cushion and upholstery.

FIG. 4A is a side view of an embodiment of the present invention with the foundation and top cushion contoured to provide lumbar support for use in a bed or sofa.

FIG. 4B is a side view of the embodiment shown in FIG. 4A, but shown with upholstery.

FIG. 4C is a side view of the embodiment shown in FIGS. 4A and 4B, but shown with the foundation and top cushion made out of only one material.

FIG. 5 is a view of an alternative seat and legrest system.

## DESCRIPTION OF INVENTION

FIG. 1A is a side view of an embodiment of the present invention having a contoured top cushion **26** and foundation **42** for providing a lumbar support. In the drawing, **42** is a foundation made of a flexible foam material such as polyurethane foam having an ILD (Indentation Load Deflection on 4" at 25%) of at least 30 pounds, or of a more rigid material such as styrofoam or other type of material that can make such a shape as shown. The foundation **42** is in a generally wedge shape and has a flat bottom, flat sides, and a flat back, but the sloped face has a convex contour **44** on the lower portion L.P.—which extends substantially from side to side. Note: If the foundation is made of rigid materials such as styrofoam, plywood, particle board, etc., the bottom, back, or even the sides could be made generally open and the inside could be substantially hollow. The purpose of the convex curve **44** is to support the lumbar region of the user's back in a relatively natural lordotic curve. The lordotic curve is a normal curve in a human's lower back. Lumbar refers to the region of the spine where the lordotic curve is.

The convex curve **44** is shaped to roughly mirror a lordotic curve. As approximately shown in FIGS. 1A and 1C, the convex curve **44** is roughly in the shape of a thin half teardrop. The curve **44** is somewhat sharper toward the bottom, and flatter as it goes up. The apex of the convex curve **44** would be about 4" to about 8" from the bottom of the slope of the foundation. Looking at the straight line from the bottom of the slope of the foundation **42** to an approximate mid point on the slope of the foundation **42** shown in FIG. 1C, the position of the highest point above this line would be about 4" to 8" from the bottom of the slope of the foundation **42**. Variables that will affect this are the thickness and firmness of the seat cushion **34**, thickness of the top cushion **26**, and degree of pitch or incline on the lower portion of the sloped face of the foundation—the higher the incline, the higher the apex will be positioned on the slope (Note: The height of the position of the apex on the slope is different from the actual height of the apex.). Also, the shape of the convex curve **44** on the lower portion L.P. would be determined by the firmness of the foundation and the thickness and firmness of the top cushion **26**. It is probably advantageous for a chair with a foundation **42** that has an ILD of about 50 to have a flatter or less pronounced convex curve **44** (an apex of about 2" would probably be appropriate) than a chair with a foundation **42** that has an ILD of about 30 (an apex of about 3" might be preferred). The curve shown in the drawing might be better suited for a foundation **42** having an ILD closer to 30. It should be pointed out that the dimensions and characteristics of the convex curve lumbar support **44** and the top cushion **26** can vary to meet comfort requirements, aesthetic considerations, or economic constraints.

The foundation also has a generally concave curve or obtuse angle bend Cb above the convex curve **44** resulting in the average general incline or pitch of the lower portion L.P. of the slope to be at a lower angle relative to a horizontal plane (such as a floor) than the average general incline or pitch of the upper portion U.P. The average general incline or pitch refers to the average of the preponderate direction of the incline, and does not take into account any major deviations from the preponderate incline or pitch, such as may be near the ends of the lower portion L.P. or upper portion L.P. This is to enable an occupant to sit on the chair with his or her lower back at a comfortable lower angle while his or her upper back and head are oriented at a higher angle for watching television or some other sitting activity.

The claims define the convex contour **44** as a generally convex semi-elliptically shaped elongated cylindrical firm lumbar support support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face. It is appropriate to view the rudimentary foundation as a generally wedge shape that has a generally concave curve between its lower portion and its upper portion, and where the lower portion is generally flat as shown in FIG. 2A as **42**. On this generally flat lower portion is a convex lumbar support **44**. This convex lumbar support can be integral and continuous with the foundation, or can be secured to the top of the lower portion of the foundation as might be the case if the foundation was made of a rigid material such as plywood, particle board etc. With regards to all of the FIGS. 1–4 which show a foundation, to go from the rudimentary foundation defined above to the ones having a convex lumbar support as shown requires the addition of a generally convex semi-elliptically shaped elongated cylindrical firm lumbar support support on the lower portion of the relatively firm foundation. This addition whether integral and continuous or not, converts the rudimentary foundations to foundations having a convex contour on their lower portion. Though the lumbar support is defined as elongated, this should not be construed limit the design from obvious variations described in the incorporated by reference U.S. Pat. No. 5,474,362.

On top of the foundation **42** is a top cushion **26** which is made of a material such as polyurethane foam and has an ILD of about 40 pounds or less. In a preferred embodiment,

the top cushion has an ILD of about 20 to 30 pounds and the foundation has an ILD of about 40 to 50 pounds, but the foundation and top cushions can certainly be made with other combinations or variations, and as will be seen in FIG. 1E, can be made of the same material. The top cushion **26** can be attached to the foundation **42** with an adhesive or with mechanical type fasteners such as buttons that might be used with the upholstery that is selected.

In a preferred embodiment, the top cushion **26** has a length of about 36 inches, is between about 2" to 4" thick, and is about 24" wide. The top cushion **26** can be made flat and then when it is attached to the foundation **42** it would follow the contours of the foundation **42**, or it can be made or cut in the in the shape of the top of the foundation **42** with all the contours.

An optional head pillow **32** is shown, and can be attached with straps or another attachment means, or the head pillow can be left loose and not attached. Note that the head pillow **32** can be used behind an occupant's neck or behind an occupant's head—as desired. The head pillow **32** in a preferred embodiment is filled with a softer material than the top cushion **26**. The filling could be a loose filling such as feathers, shredded polyurethane foam, dacron, etc., or could be a very soft polyurethane foam material, preferably with an ILD (Indentation Load Deflection on 4" at 25%) of about 12 pounds. The straps or other attachment means for the head pillow would be attached either directly to the foundation **42** or to upholstery that goes on either the top cushion **26** or on the foundation **42**. In a preferred embodiment, the straps are made so that the position of the pillow can be adjusted to suit personal preferences. Though a preferred embodiment uses straps for the head pillow, these straps are not essential to the head pillow working properly, but it makes things a little more convenient. Also, though a soft material for the head pillow **32** is suggested, it is understood that personal preferences vary, and that some people prefer a firm pillow.

Additionally a seat cushion **34** is shown for supporting the buttocks and at least part of an occupant's legs. In a preferred embodiment, the seat cushion **34** is filled with a firmer material than the top cushion **26**. The reason for this is that in addition to preventing the user from sliding down, a lot of the user's weight is concentrated on the seat cushion **34**. The seat cushion **34** can be filled with loose fill such as feathers, shredded polyurethane foam, dacron, etc., or could be a relatively firm polyurethane foam material, preferably with an ILD (Indentation Load Deflection on 4" at 25%) of about 40 pounds. If a loose fill material is used, it can be packed much more tightly than for the head pillow **32** mentioned above. The seat cushion **34** can be made with a material about as firm as the top cushion **26**, but if it is, it probably should be thicker. It is also possible to make the seat cushion **34** in layers, with the bottom layer(s) of firmer material and the top layer(s) of a softer material. In general, the seat cushion **34** should be more supportive than the top cushion **26** (an exception might be if the top cushion **26** is made of an extra firm material with an ILD greater than 40 pounds or if it was made more than 5" thick).

The general dimensions of a presently preferred embodiment are as follows: the foundation **42** base is approximately 20" to approximately 22" wide (measured from side to side) and approximately 22" to approximately 24" from front to back, the foundation back is approximately 20" to approximately 22" wide (measured from side to side) and approximately 22" to approximately 24" from the base to the top, the main cushion **26** is approximately 24" wide (measured from side to side), approximately 4" thick, and approximately 36" long. The seat cushion is about 24" wide (measured from side to side), 5" thick (at highest point), and between approximately 12" and approximately 20" from front to back. The head pillow is about 14" to about 18" from side to side, about 6" to about 10" from top to bottom, and about 2" thick. All components are in approximately the shapes shown in the figures. Note: There can be a great variance in dimensions and shapes due to particular heights of users, preferences of users, to meet certain design or aesthetic desires, to adjust the angle of the face of the foundation **42** for different levels of relaxation or alertness, for economic or manufacturing reasons, or for other reasons. Having stated this, it is certainly possible for someone skilled in the art to make a satisfactory working model with the dimensions given and the shapes shown in the FIGS.

The foundation **42**, top cushion **26**, seat cushion **34**, and head pillow **32** can be made out of blocks of polyurethane foam, and cut to size and shape with band saws or other cutting tools used in the art related to foam fabricating. Various additional methods of manufacturing are also described under FIGS. **2A–2F** and may be used for this embodiment.

FIG. **1B** is a side view of the embodiment shown in FIG. **1A**, but shown with upholstery **30**. Note that the seat cushion **34** is attached to the foundation **42** or the upholstery **30** on the foundation with an upholstery attachment means **35**. Unlike the head pillow straps mentioned above, this upholstery attachment means **35** or a similar means of securing the seat cushion **34** to the foundation **42** are essential to the proper working of the of this embodiment. The reason is that when a person is sitting on the leisure chair, there is a natural tendency to slide down caused by gravity. The seat cushion **34** is designed to prevent the user from sliding down, and needs to be secured so that the user won't slide down and move the seat cushion **34** while he or she slides down. It is not necessary that the seat cushion **34** be secured directly to the foundation **42**, because if it is secured to the upholstery **30** or something else which is secured to the foundation **42**, it will be indirectly secured to the foundation **42**. In a preferred embodiment, the upholstery attachment means **35** could be upholstery material **30** from both the seat cushion **34** as well as the top cushion **26** joined together. I would compare this to the way the top of a typical bag of potato chips is sealed—with material from the front and back of the packaging being joined together and extending beyond the fillable portion of the package leaving a flap. In a similar manner, the seat cushion **34** could be put into upholstery material **30** that has been sewn together somewhat like a pillowcase or an open bag. After filling the upholstery **30** with the seat cushion **34**, the open portion could be stitched closed, but in a manner that leaves the flap shown as the attachment means **35**. This flap could then be attached to the foundation **42** or to upholstery **30** under the foundation with velcro, stitching, or possibly mechanical fasteners. The same type of technique could be used to close the bottom of the upholstery **30** on the top cushion **26**—though it is not necessary that both the seat cushion **34** and top cushion **26** be secured together in this manner. Other methods that would be suitable for attaching the seat cushion **34** to the foundation **42** or upholstery **30** such as straps etc. are known in the art related to upholstery.

FIG. **1C** is a side view of the embodiment shown in FIGS. **1A** and **1B**, but shown in phantom lines to show how the average general pitch of the lower portion L.P. of the chair is at a lower angle relative to a horizontal plane than the upper portion U.P. In the drawing, there are lines showing the average general pitch of the lower portion A.L.P. and the

average general pitch of the upper portion A.U.P. and showing how these average general pitches meet between the lower portion L.P. and the upper portion U.P. to form an obtuse angle C. In a preferred embodiment, the obtuse angle C is about 170 degrees, but it can be between about 160 degrees and about 179 degrees.

The lower portion L.P. is designed to support a user's back from the sacrum to a middle range of the occupant's thoracic vertebrae. The desired middle range is known as a kyphotic curve. In a preferred embodiment, the lower portion L.P. of the top cushion **26** as measured from the bottom of the top cushion **26** to the obtuse angle C is about 16" to about 18". The upper portion U.P. is designed to support the user's back from the middle range of the occupant's thoracic vertebrae to the top of the user's skull. In a preferred embodiment, the upper portion U.P. of the top cushion **26** as measured from the obtuse angle C to the highest point of the top cushion is about 18" to about 20". These measurements can vary somewhat, especially if the backrest leisure chair is designed for children or for people of heights different from fairly average U.S. heights, or for aesthetic or economic reasons.

FIG. **1D** is a side view of the embodiment shown in FIGS. **1A** and **1B**, but shown with an alternative seat cushion system. In the drawing, the seat cushion system is shown made with two parts,—a buttocks and thigh portion **34***b* and a calf and foot portion **34***a*. Note: For clarity in the description of this drawing and all other drawings in this application, the front of the chair is shown on the left, and the rear of the chair is shown on the right. The lower cushion **34***b* is made from a generally rectangular flexible foam cushion approximately 4" high, 24" from side to side, and about 18" to 20" from front to back. The upper cushion **34***a* is made of a cushion generally similar in dimensions to the lower cushion, except that it slopes down from what is shown in the drawing as left to right. These cushions **34***a* and **34***b* can be pivotally attached like a hinge at what is shown as the front of the seat system when they are stacked. Also shown near the front is an arrow showing how the top seat cushion **34***a* can pivot if desired. The advantage of this seat system is that it enables a floor chair to be similar to a lounge in terms of completely supporting the user's legs, but at the same time it can be both stored and used in the folded position as shown. The seat system can also be made to be unfolded with the bottom cushion folding forward or being rotated in a clockwise direction as opposed to the counterclockwise arrow shown, while the top cushion stays in position—except for moving down. Of course to do this, the top cushion **34***a* would have to be attached to the attachment means **35**. A seat system similar to the one shown in FIG. 1D is shown and described under FIGS. **2E** and **2F** which can be consulted to aid in understanding this type of seat cushion system. And of course, the seat system could be made out of one piece instead of the two **34***a* and **34***b* as shown. In this case, the seat cushion would always be in what for the system shown would be the open or unfolded position, and for storage, could simply be folded over the pitched face of the foundation and top cushion. And for different preferences, the cushions could be reversed, with the buttocks and thigh cushion being sloped while the calf and foot cushion is generally rectangular.

FIG. **1E** is a side view of an embodiment similar to the ones shown in FIGS. **1A–1D**, but shown with the foundation **42***s* and top cushion **26***s* made out of the same material. In the drawing, **42***s* is a foundation that has an integral and continuous top cushion **26***s* on it or a top cushion made of the same type of material as the foundation. This could be done following principles discussed under FIG. **1A** where the material is soft enough to be acceptable as a top cushion, but firm enough to support a human occupant. A polyurethane foam material with an ILD of about 35. pounds might be acceptable. As shown, the foundation **42***s* and top cushion **26***s* combination has a bend or curve as indicated by Cb that is less than 180 degrees in such a manner that the average general pitch of the slope of the upper portion U.P. is greater than the average general pitch of the lower portion L.P. For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion **26***s*, and though it may be technically the same material, it is considered as a foundation with a top cushion.

FIG. **2A** is an isometric view of an embodiment of the present invention using a high firmness support foundation **42** made of styrofoam, polyurethane foam or the like. The main or top cushion **26** is shown clear in this drawing to show the support foundation **42**. The support foundation **42** could be made from a variety of materials including a high firmness polyurethane foam, styrofoam, etc. which would be generally solid, or it can be made of something like fiberglass, plywood or a plastic wherein the top, sides, back and possibly the bottom are made of the material, but inside is generally hollow. In the drawing, the leisure chair is shown so it can be used in either a reclining position as shown, or in a more upright position if it were rotated 90 degrees so that what is shown as the back of the support foundation **42** would become the bottom of the support foundation, and what is shown as the bottom becomes the back. To switch positions, it would also become necessary to switch the positions of the seat cushion **34** and the head pillow **32**. In doing this, the straps for the head pillow **33** become the straps for the seat cushion, and the straps for the seat cushion **35** become the straps for the head pillow. This would be accomplished by making the straps with a quick lock and release mechanism similar to those on seat belts for baby strollers. Since the backrest/leisure chair can be dual position, it is necessary to have a lumbar support for both positions. In the drawing, there are lumbar support contours **44** on the support structure of both the lower portion L.P. and on the upper portion U.P. Though not shown this way, these lumbar supports could be part of the main cushion **26**, by making a hollow in the main cushion **26** of the proper size and shape, and then filling the hollow with the lumbar support—as described in my previous applications of which this is a continuation in part. Of course, when the leisure chair is put in the more upright position, the lower portion L.P. would become the upper portion U.P. and vice versa. Also in FIG. **2A**, there is an obtuse angle C between the upper portion U.P. and the lower portion L.P. of about 160 degrees to about 170 degrees.

The leisure chair shown in FIG. **2A** works the same way as the leisure chair shown in FIG. **1**, except that instead of being for use in only one position, it is dual position. It should be pointed out that though FIG. **2A** shows a leisure chair that is dual position, it is of course possible to make it for use in just one position. If the leisure chair was made for only one position, it would only need one lumbar support **44**. The position chosen could be upright, reclining, or somewhere in between. In FIG. **2A** the head pillow **32** is attached to straps for the head pillow **33** which are secured to the support foundation **42**. The seat cushion **34** is attached to straps **35** or another suitable upholstery attachment means which would be secured either directly or indirectly to the high firmness support foundation. Though the methods of securing the straps to the support foundation will vary with the type of material the support foundation is made of, the straps must be secured well enough to the support founda-

tion to keep the seat cushion from moving away from the support foundation when a person is sitting on it. This may require using some sort of metal anchoring system into the high firmness support foundation **42**. For example, for a styrofoam support foundation **42** a metal anchor could be put in place while the foundation is being molded, so that when the styrofoam sets, the anchor would be securely attached to the styrofoam, and the anchor would be made so that a strap could be attached to it. One way of doing this would be to have a ring on the exposed portion of the anchor so that the strap could go around it. Other methods should be apparent to people knowledgeable in the art of working with materials suitable for making a high firmness support foundation.

The way of making the high firmness support foundation **42** will depend on the type of material chosen. Styrofoam, plastic, or fiberglass would probably be molded out of one piece. If the chosen material was a flexible polyurethane foam cushion with an ILD of about 50, it could be cut into shape with a band saw from a large piece of slab material. It could also be made out of plywood, with lumbar supports made of firm polyurethane foam installed to the plywood decks that form the slope of the foundation.

There are two other ways to make a high firmness support foundation and the backrest/leisure chair of this type of embodiment. Both methods involve having an internal high firmness member or members. The first method requires a mold for doing injection molding of the soft foam over the firm internal support foundation. The mold would be about the same size and shape as the foundation **42** with the soft top cushion **26** over it shown in FIG. **2B**. A firm foundation of a similar size and shape as shown in FIG. **2A**, except with about 1" (could be more than 1") trimmed off on the back, the bottom, and each of the two sides, would be put into the mold. This firm foundation would be held in place in the mold so that the back, the bottom, and each of the two sides would be about 1" away from the back, the bottom, and each of the two sides of the mold. The mold would be sealed closed, and a flexible foam material would be injected into the mold so that the finished product would be about the same size and shape of the foundation **42** with the soft top cushion **26** over it shown in FIG. **2B**. The result would be a molded one piece generally wedge shaped foundation with soft top cushion which also has the bottom, the back, and each of the two sides cushioned with the soft cushion material.

Another way to make an embodiment similar to the one shown in FIG. **2B** is to make both a generally wedge shaped foundation and top cushion out of a relatively soft foam material but use firm internal support members to provide the equivalent of a relatively firm foundation. The generally wedge shaped foundation and top cushion would be of about the same size and shape as those shown in the embodiment in FIG. **2B**, except there would be no lumbar support contours **44** like those shown in FIG. **2A**. The soft wedge shaped foundation and top cushion could be made in one piece or made of two pieces in a manner similar to that shown for FIGS. **2A** through **2C**. To provide lumbar supports, cavities or hollows would be made in the generally wedge shaped foundation and top cushion, and a relatively firm generally cylindrical, generally semi-cylindrical, or other shaped insert would be inserted therein according to the methods described in my previous patent applications contained herein by reference. The cavities or hollows and the firm internal support members would be placed at the position where each of the lumbar supports **44** in FIG. **2A** are placed. The embodiment made after using the procedures described would have the effect of providing a relatively firm generally wedge shaped foundation, a softer top cushion, and a means for supporting occupant's lumbar region in a relatively natural lordotic curve, and is to be considered as such for the purposes of the claims.

FIG. **2B** is an isometric view of the embodiment shown in FIG. **2A**, but showing the main cushion **26** normally. In a presently preferred embodiment, the lower portion L.P. when measured from the bottom edge near the seat cushion **34** to the obtuse angle C is between about 16 inches and about 18 inches. Also, in the same preferred embodiment, the upper portion U.P. when measured from the obtuse angle C to the top edge near the head pillow **32** is between about 18 inches and about 20 inches—though there can be some variance based user height or preference.

FIG. **2C** is an isometric view of the embodiment shown in FIGS. **2A** and **2B** with a cutaway showing the support foundation **42**, main cushion **26**, and upholstery **30**. The cutaway shows how a lumbar support **44** and the main cushion **26** are shaped to fit with each other. The main cushion **26** has a hollow or recess that corresponds to each of the firmer generally semi-elliptically shaped cylindrical contours that are the lumbar supports **44**, and of course the main cushion **26** is placed over the support foundation **42**. The main cushion **26** is attached to the support foundation **42** with a glue suitable for polyurethane foam or the like. The upholstery **30** is secured around the support foundation **42** and of course around the main cushion **26**.

FIG. **2D** is an isometric view of the embodiment shown in FIGS. **2A**, **2B**, and **2C** with upholstery.

FIG. **2E** is a side view of the embodiment shown in FIGS. **2A**–**2D**, but with an alternative seat system.

FIG. **2F** is a side view of the embodiment shown in FIG. **2E**, but with the alternative seat system in the extended position. Note: Though this seating system is shown in two pieces **34***a* and **34***b*, it can certainly also be made of one piece that is not foldable. Note that an optional depression **36** is shown in the calf portion of the seat and legrest cushion **34** to serve as a foot support.

FIG. **3A** is an isometric view of an embodiment of the present invention using a generally wedge shaped high firmness foundation for use in bed or on a sofa. In this view, the main cushion **48** is shown clear to show the high firmness support foundation **46**. In the drawing, the high firmness support foundation **46** is made of a material such as styrofoam or flexible polyurethane foam with an ILD of about 50 or 60 pounds. If the foundation **46** is made of styrofoam, it would probably be shaped in an injection type mold, whereas if the foundation **46** was made of flexible polyurethane foam it could either be formed in a mold, or cut and shaped out of a large piece of slab cushion material with a band saw or the like. The foundation **46** is similar to the firm foundation **42** shown in FIGS. **2A**, **2B**, and **2C**, except it is a bit smaller, and the lumbar supports **44** start at or near the top and bottom edges. The reason the high firmness support **46** and the main cushion **48** shown in FIG. **3A** are smaller than their counterparts the high firmness support foundation **42** and the main cushion **26** in FIG. **2A** is that a person sitting on a bed or sofa will sink a few inches into the bed or sofa. When the person's body sinks down into the sofa or mattress, that means that there is less of the person's lower back left to support, because some of the person's back is now below the level of the backrest. Also, since the person sinks into the mattress or sofa, the need for a seat cushion like **34** on FIG. **2C** to keep the user from slipping down is greatly reduced—especially with a good mattress

with independent springs. This is because the natural give of a bed or sofa provides a natural seat cushion, and since most of the weight is focussed on the point where the buttocks meet the mattress, the user will sink into the mattress in a way that will prevent slipping down—eliminating the need for a seat cushion. One other possible difference between the high firmness support foundation **46** and the high firmness support foundation **42** shown in FIG. **2A** is that it would probably only be appropriate to make the support foundation out of a softer lighter material such as flexible polyurethane foam or styrofoam, since it will be desirable to put it on a bed or sofa. Materials such as plywood or fiberglass are so hard that few people would want to put it on a bed or sofa. There would also be a safety concern with a backrest made to be used above the floor, if it were made of a heavier or harder material. If such a backrest fell on someone, it could cause injury, especially if it were to fall on a small child.

There are two other ways to make a high firmness support foundation and the backrest of this type of embodiment. Both methods involve having an internal high firmness member or members. The first method requires a mold for doing injection molding of the soft foam over the firm internal support foundation. The mold would be about the same size and shape as the foundation **46** with the soft top cushion **48** over it shown in FIG. **3A** or FIG. **3B**. A firm foundation of a similar size and shape as shown in FIG. **3A**, except with about 1" (could more than 1" if desired) trimmed off on the back, the bottom, and each of the two sides, would be put into the mold. This firm foundation would be held in place in the mold so that the back, the bottom, and each of the two sides would be about 1" away from the back, the bottom, and each of the two sides of the mold. The mold would be sealed closed, and a flexible foam material would be injected into the mold so that the finished product would be about the same size and shape of the foundation **46** with the soft top cushion **48** over it shown in FIG. **3B**. The result would be a molded one piece generally wedge shaped foundation with soft top cushion which also has the bottom, the back, and each of the two sides cushioned with the soft cushion material.

Another way to make an embodiment similar to the one shown in FIG. **3B** is to make both a generally wedge shaped foundation and top cushion out of a relatively soft foam material but use firm internal support members to provide the equivalent of a relatively firm foundation. The generally wedge shaped foundation and top cushion would be of about the same size and shape as those shown in the embodiment in FIG. **3B**, except there would be no lumbar support contours **44** like those shown in FIG. **3A**. The soft wedge shaped foundation and top cushion could be made in one piece or made of two pieces in a manner similar to that shown for FIGS. **3A** and **3B**. If made in one piece, it could be cut out of a piece of slab foam material with a band saw or other type of cutting tool used in the foam industry. To provide lumbar supports, cavities or hollows would be made in the generally wedge shaped foundation and top cushion, and a relatively firm generally cylindrical, generally semi-cylindrical or other shaped insert would be inserted therein according to the methods described in my previous patent applications. The cavities or hollows and the firm internal support members would be placed at the position where each of the lumbar supports **44** in FIG. **3A** are placed. The embodiment made after using the procedures described would have the effect of providing a relatively firm generally wedge shaped foundation, a softer top cushion, and a means for supporting occupant's lumbar region in a relatively natural lordotic curve, and is to be considered as such for the purposes of the claims.

FIG. **3B** is an isometric view of the embodiment shown in FIG. **3A** with a cutaway showing the support foundation **46**, the main cushion **48**, and upholstery **30**. The main cushion **48** is made of relatively soft material such as flexible polyurethane foam with an ILD of about 20 pounds. The drawing shows how the main cushion **48** is shaped to fit over the lumbar supports **44** on the high firmness support foundation **46**. The main cushion **48** would be glued to the support foundation **46** with a glue suitable for polyurethane foam or the like. The main cushion **48** has a hollow or recess that corresponds to each of the firmer generally semi-elliptically shaped cylindrical contours that are the lumbar supports **44**, and of course the main cushion **48** is placed over the support foundation **46**. In a preferred embodiment, the lower portion L.P. of the main cushion **48** is between about 12 inches and about 14 inches when measured from the bottom or front edge to the obtuse angle C. The obtuse angle C is between about 160 degrees and about 170 degrees and in a preferred embodiment is about 165 degrees. The upper portion U.P. is about the same size as the lower portion L.P. The backrest shown is dual position, and so it has contoured lumbar supports **44** on the high firmness support foundation **46**. The slope of the lower portion L.P. of a preferred embodiment of the backrest is about 30 degrees. This means that the slope of the upper portion U.P. of the backrest is about 45 degrees. When the backrest is put in the alternate or upright position (the back becomes the bottom, and the bottom becomes the back), the slope of what will now become the lower portion L.P. (formerly the upper portion U.P.) will be about 45 degrees, while the upper portion U.P. (formerly the lower portion) will be about 60 degrees. Though the backrest is shown as dual position, it can of course be made for use in a single position. To make it for use in a single position, only one lumbar support would be required, and it would probably be desirable to make the slope of the lower portion L.P. between 30 degrees and 45 degrees.

FIG. **3C** is an isometric view of the embodiment shown in FIGS. **3A** and **3B** with finished upholstery **30**. It should be noted that there is no attached head pillow with this. The reason for this is that a user can supply their own pillow, especially when the backrest is used in bed or on a sofa. Though a head pillow could be attached, it does not seem to be essential, and the additional bulk a head pillow adds does not seem to justify the convenience provided when a person already has a pillow in bed or on a sofa.

FIG. **4A** is a side view of a generally wedge shaped embodiment of the present invention similar to the one described in FIGS. **3A–3C**, but with the top cushion **48** and foundation **46** contoured to provide a lumbar support. FIG. **4A** has a convex contour **43** on the lower portion L.P. on both the cushion and foundation to provide the lower back support without the internal lumbar support. The convex contour **43** is designed to support the lumbar region of the user's back in a relatively natural lordotic curve. The embodiment in FIG. **4A** is for use in a bed or sofa and uses the same principles of construction as were described for FIGS. **1A–1C** and further using the principles described in FIGS. **3A–3C** with regards to positioning of the lumbar support **43** and use. Unlike the embodiment shown in FIG. **3**, this embodiment is only shown for single position use.

FIG. **4B** is a side view of the embodiment shown in FIG. **4A**, but shown with upholstery **30**. In the drawing, there is an obtuse angle bend Cb between the upper portion U.P. and the lower portion L.P. which results in the average general pitch of the sloped face on the lower portion L.P. being at a lower angle relative to a horizontal plane such as a bed than the upper portion U.P.

FIG. 4C is a side view of the embodiment shown in FIGS. 4A and 4B, but shown with the foundation and top cushion made out of only one material 4C. This simply shows how the embodiment described in FIG. 4A can be made using principles similar to those described for FIG. 1E.

FIG. 5 is an alternative seat cushion 34*b* and an alternative legrest system 34*a* that could be used on the embodiments shown in FIGS. 1 and 2, as well as most of the legless leisure chairs described in my other patent applications. In the drawing, part of the seat cushion 34*b* is placed under the main backrest cushion 26 as shown. The seat cushion 34*b* could be made by putting a suitably sized and shaped cushion into an upholstery "bag" generally similar in construction to the way a pillowcase is made, but the upholstery bag would have about 6" of material extending at the open end beyond the cushion, for attaching to the foundation or frame of a legless leisure chair. This type of construction could be simpler than attaching straps, as well as somewhat more secure. The legrest portion 34*a* would be made of a cushion material upholstered, and having a generally flat top and bottom, having about the same width (side to side measurement) as the seat cushion 34*b*, a front to back measurement of about 10" to 18", and a height generally similar to the height of the seat cushion 34*b*. The top of the legrest cushion 34*a* could be pitched somewhat from front to back. The edge facing the main cushion 26 (which would be the back edge) can be shaped to accommodate the arches an occupant's feet while the top is shaped to accommodate the occupant's calves. The bottom of the upholstered legrest cushion 34*a* should be made in a manner that would prevent it from moving away from the main backrest cushion 26. This can be accomplished in a number of ways, in the case of a velvet material, the pile can be made to run in the direction that would make it catch on a carpet and keep it from moving away from the backrest cushion 26. Other solutions would include using material having a number of prongs on it such as the scratchy side of velcro type material. For use of a hard surface floor, a rubber or other non skid type material would be suitable, and also, a number of suction cups could be used. This type of seat and legrest system has the advantage of being adjustable, simple to manufacture, and makes it very convenient to make the chair compact when not in use by just putting the legrest portion 34*a* on the seat cushion 34*b*. While in a preferred embodiment, the seat cushion 34*b* is not in any way attached to the legrest cushion 34*a*, it certainly could be if desired with straps, strings or a similar attachment means.

## CONCLUSIONS, RAMIFICATIONS, AND SCOPE OF INVENTION

Thus the reader will see that the leisure chairs and backrests of this invention are economical, attractive, useful, compact, and very comfortable for sitting or reclining.

Although my above description contains many specificities, these should not be construed as limiting the scope of the invention, but merely as providing illustrations of the presently preferred embodiments of this invention. Many other variations are possible. This invention can be made a number of ways, with a wide variety of materials, it can be made with a number of accessories as part of it or to used be with it, and the principles of this invention can be applied to a number of other uses.

It is known in the industry that people have different preferences when it comes to comfort, and while the descriptions of firmness, shapes, and sizes described in this application are specific, for many people variations would be preferred. Guidelines for making chairs such as those described herein for various groups of people and their preferences are available in the industry through such resources as HumanScale and ANSI standards. For example, the dual position leisure chairs or backrests can instead be made single position at an angle that would be some happy medium between those shown and described. Also, there are alternative ways of providing the lumbar supports on chairs such as having the center (with respect to the sides) of the lumbar curve or support on the firm foundation being of a softer material to reduce stress on the spine.

The backrests/leisure chairs can be made for multiple users like a love seat by making it wider, can be made in children's sizes, and can be made in tall sizes. The look of the leisure chairs can be changed drastically making them with styles similar to those used on wide variety of typical upholstered armchairs. It is also possible that another high firmness cushion insert could be placed behind the shoulder area as well as the lumbar region to assist in orienting the upper body. The support surface can be made somewhat concave from the left side to the right side to correspond with the shape of the chest/abdomen etc. of the human body. And though the backrests/leisure chairs are more comfortable with the lumbar supports described, for more economical backrests/leisure chairs, an ordinary cushion without any means for providing a specific lumbar support can be used for the main cushion, and could be placed over a flat foundation. Other embodiments can be made using inflatable materials such as inflatable cushions, with a head pillow as an integral part of the upper portion, or could be made in a manner similar to the way automobile seats are made, with a process where the slope frame is put in a mold and a cushion is injection molded around the foundation or frame. And it is not necessary that the head pillow be attached.

The backrests/leisure chairs can be made of a great variety of materials. The foundation can be made of polyurethane foam, polyester foam, styrofoam or other foam), plywood, particle board, plastic, fiberglass, etc. The cushions including the top cushion 26, seat cushions 34 and head pillow 32 can be made of a variety of materials including cotton, feathers, polyurethane foam, soft polyester fill, dacron fill, shredded foam, and other relatively materials either known or to be known in the industry. The upholstery can be made of fabric, vinyl, leather, etc.

Other methods, materials, and techniques that can be applied to making backrests and leisure chairs of this invention are known or will be known in the industry relating to this invention.

The backrests/leisure chairs of this invention are suitable for being used with a number of accessories. One such accessory is a work surface such as a desk top adapted for use with the chair. Also, a specially designed type of ottoman or legrest can be used with the backrest/leisure chair. The area under the slope can be designed to hold a storage compartment for books or something similar. Since the backrest/leisure chair is near the floor, special lights for reading may be desired. It is also possible to attach a device to hold a book, using principles similar to those used in the type of lamps used by draftsmen. Additionally, a chair with a support foundation could have armrests.

The principles of this invention can be applied to futon designs, to chaise type lounges or other type lounges.

Though it presently seems preferable to make the leisure chair with a softer top cushion, for embodiments such as FIGS. 1 and 4, it is quite possible to make the top cushion of the same firmness, or possibly even slightly more firm

than the foundation, if the foundation was not especially firm. Also, for aesthetic reasons, the top cushion can be the same size, larger, or smaller than the face of the foundation, and can also be of different thicknesses.

The seating systems shown in various embodiments are interchangeable among the embodiments, for example the seating system shown in FIGS. **2E** and **2F** could be used for the embodiment in FIG. **1A**, likewise the seating system used in FIG. **1D** could be interchanged with the seating system shown in FIGS. **2E**, **2F**, and **5**, etc. Further the seating system shown suggests other possibilities as well, for example the seating systems shown in FIGS. **1D** and **2F** could be made with out the **34***a* portion. And the seat attachment means can vary. Additionally, the seating systems shown in FIGS. **1D**, **2E**, **2F** and **5** could quite suitably be used on other chairs such as those described in my previous applications.

Design, methods of construction, details and methods of manufacture are interchangeable between embodiments.

Accordingly, the scope of the invention should be determined not by the embodiments illustrated, described, and measurements, but by the appended claims and their legal equivalents.

I claim:

**1**. A backrest/leisure chair comprising:

(a) a relatively firm generally wedge shaped foundation having a sloped face, a base, a back and two sides, the face being oriented at an acute angle from the base to define a generally wedge shape, the face further having an obtuse angle generally at its midpoint which orients an upper portion of the face at a higher angle than a lower portion;

(b) a softer top cushion having an upper and lower portion secured to the face; and

(c) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied.

**2**. The backrest/leisure chair of claim **1** wherein said means for supporting a natural lumbar lordotic curve is a relatively firm generally semi-elliptically shaped cylindrical contour on the foundation, with the softer top cushion having a hollow that corresponds to the semi-elliptically shaped contour, placed over the foundation.

**3**. The backrest/leisure chair of claim **1** wherein said generally wedge shaped foundation has a convex contour on the lower portion of said face for supporting the lumbar curve of the user in a relatively natural lordotic curve, when a top cushion of is placed over it, and wherein the top cushion generally follows the convex contour of the foundation.

**4**. The backrest/leisure chair of claim **1** wherein the generally midpoint on the face has a means for cradling the middle range of the occupant's thoracic vertebrae.

**5**. The backrest/leisure chair of claim **1** wherein said obtuse angle is between about 160 degrees and about 170 degrees.

**6**. The backrest/leisure chair of claim **1** wherein the acute angle of the lower portion of the generally wedge shaped foundation relative to a horizontal plane is between about 20 degrees and about 70 degrees.

**7**. The backrest/leisure chair of claim **1** further including a seat cushion having an attachment means secured to the lower portion of the foundation, suitable for providing comfort to the buttocks when sitting on the floor, and at the same time preventing the occupant of said leisure chair from slipping down out of position.

**8**. The backrest/leisure chair of claim **7** further including an unattached legrest cushion for supporting the lower legs of the user, and having a generally slip resistant surface on the bottom of its upholstery.

**9**. The backrest/leisure chair of claim **1** wherein a pillow is provided for a head rest, and wherein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation.

**10**. A backrest/leisure chair comprising:

(a) a relatively firm generally wedge shaped foundation having a face, a base, a back and two generally triangular sides, with the base being positioned parallel to a horizontal plane such as a floor or bed, and the face being oriented at an acute angle relative to both the base and the horizontal plane to define a generally wedge shape, wherein said face has an upper portion and a lower portion, wherein said upper portion has an average general pitch relative to the horizontal plane and said lower portion has an average general pitch relative to the horizontal plane, and wherein said face further has a contour which orients the average general pitch of upper portion of the face at a greater incline than the average general pitch of the lower portion;

(b) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and

(c) a top cushion having an upper and lower portion secured to the face of the generally wedge shaped foundation.

**11**. The backrest/leisure chair of claim **10** wherein the top cushion is integral and continuous with the generally wedge shaped foundation.

**12**. The backrest/leisure chair of claim **10** wherein the firm foundation has an ILD firmness of at least 30 pounds.

**13**. The backrest/leisure chair of claim **10** wherein the top cushion has an ILD firmness of less than 41 pounds.

**14**. The backrest/leisure chair of claim **10** wherein said means for supporting a natural lumbar lordotic curve is a relatively firm generally semi-elliptically shaped cylindrical contour on the foundation, with the softer top cushion having a hollow that corresponds to the semi-elliptically shaped contour, placed over the foundation.

**15**. The backrest/leisure chair of claim **10** wherein said generally wedge shaped foundation has a convex contour on the lower portion of said face for supporting the lumbar curve of the user in a relatively natural lordotic curve, when a top cushion of is placed over it, and wherein the top cushion generally follows the convex contour of the foundation.

**16**. The backrest/leisure chair of claim **10** wherein the generally midpoint on the face has a means for cradling the middle range of the occupant's thoracic vertebrae.

**17**. The backrest/leisure chair of claim **10**, wherein an obtuse angle is formed by the intersection of the average general pitch of the lower portion and the average general

pitch of the upper portion, and wherein said obtuse angle is between about 160 degrees and 170 degrees.

**18**. The backrest/leisure chair of claim **10** further including a seat cushion having an attachment means secured to the lower portion of the foundation, suitable for providing comfort to the buttocks when sitting on the floor, and at the same time preventing the occupant of said leisure chair from slipping down out of position.

**19**. The backrest/leisure chair of claim **10** further including an unattached legrest cushion for supporting the lower legs of the user, and having a generally slip resistant surface on the bottom of its upholstery.

**20**. The backrest/leisure chair of claim **10** wherein a pillow is provided for a head rest, and wherein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation.

**21**. A backrest/leisure chair comprising:

(a) a generally wedge shaped support foundation having an inclined face, said face comprising an upper portion and a lower portion, with the lower portion of the face being oriented at an acute angle relative to a horizontal plane such as a floor or bed, said upper portion further having an average general pitch relative to the horizontal plane and said lower portion having an average general pitch relative to the horizontal plane, said inclined face further having a valley generally in the area where the upper portion and lower portion meet resulting in the average general pitch of upper portion of the face being at a greater incline relative to the horizontal plane than the average general pitch of the lower portion relative to the horizontal plane, wherein said valley provides a means for cradling an occupant's throracic curve, said support foundation further having a convex contour on the lower portion of said face for supporting an occupant's lumbar region in a relatively natural lordotic curve, said convex contour being generally uniform in cross sectional shape like a generally semi-elliptically shaped elongated cylinder which extends substantially to a lower edge of said inclined face, said convex contour further having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and

(b) a top cushion having an upper and lower portion secured to the face of said generally wedge shaped foundation.

* * * * *

US005836653C1

(12) EX PARTE REEXAMINATION CERTIFICATE (7253rd)

# United States Patent

Albecker

(10) Number: US 5,836,653 C1
(45) Certificate Issued: Dec. 22, 2009

(54) **BACKRESTS/LEGLESS LEISURE CHAIRS MADE WITH A FOUNDATION**

(76) Inventor: **Walter J. Albecker**, 838 S. May, Chicago, IL (US) 60607

**Reexamination Request:**
No. 90/010,398, Apr. 1, 2009

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,836,653** |
| Issued: | **Nov. 17, 1998** |
| Appl. No.: | **08/492,170** |
| Filed: | **Jun. 19, 1995** |

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 07/899,750, filed on Jun. 17, 1992, now Pat. No. 5,425,567, and a continuation-in-part of application No. 07/721,179, filed on Jun. 26, 1991, now abandoned, and a continuation of application No. 08/197,223, filed on Feb. 16, 1994, now Pat. No. 5,474,362.

(51) **Int. Cl.**
*A47C 20/00* (2006.01)

(52) **U.S. Cl.** .......................... **297/452.31**; 297/452.16; 297/452.32; 5/632; 5/633

(58) **Field of Classification Search** .................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,361,471 A | 1/1968 | Radford | 297/230 |
| 3,555,582 A | 1/1971 | Raford | 5/338 |
| D259,381 S | 6/1981 | Smith | D6/200 |
| D274,576 S | 7/1984 | Tiffany | D6/335 |
| 4,473,913 A | 10/1984 | Ylvisaker | 5/435 |
| 4,712,833 A | 12/1987 | Swanson | 297/219 |
| 4,752,293 A | 6/1988 | Smith | 604/322 |
| D334,107 S | 3/1993 | Johnson | D6/601 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 1654298 | 5/1967 |
| DE | 2834947 | 7/1978 |

*Primary Examiner*—Jeanne M. Clark

(57) **ABSTRACT**

A number of generally wedge shaped backrests and legless leisure chairs for sitting on the floor or on a bed, which orient the user's upper back at a higher angle than the user's lower back. These are ideally suited for people who want to be in a reclining type position, but yet want to do something like watch television. The backrests/leisure chairs disclosed use a support foundation (**42** and **46**). The backrests/leisure chairs described also have a way of maintaining the lumbar region of the user's back in a relatively natural lordotic curve, some through a high firmness lumbar support member (**28**) on the support foundation (**42** and **46**) placed in a hollow in the back of the main cushion (**26**), and others through making a convex contour on the lower portion of the backrest/leisure chair. All of the leisure chairs for sitting on the floor have a seat cushion (**34**) to prevent the user from slipping down out of place and these chairs can also have a pillow (**32**) for a headrest. Also disclosed are a member of seat cushion and legrest alternatives (**34**) for the leisure chairs including folding seat cushions and a two piece seat and legrest cushion system.



1

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**-**21** is confirmed.

* * * * *

# Exhibit – B

**Judgment and Opinions of Trial Court**

B-1 … Minute entry of Judge E. Chang, January 21, 2014
B-2 … Judgment, January 6, 2014
B-3 … Ruling on Motion to Reconsider, September 27, 2013
B-4 … Initial Claim Construction Ruling, May 3, 2010

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.1**
**Eastern Division**

Walter J Albecker

Plaintiff,

v.

Case No.: 1:09–cv–00631
Honorable Edmond E. Chang

Contour Products, Inc. (FL), et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 21, 2014:

MINUTE entry before the Honorable Edmond E. Chang: Plaintiff's motions to alter or amend judgment [137] and to amend infringement contentions [137] are denied. On the request to alter or amend judgment, the motion repeats rejected arguments, both by Chief Judge Castillo and this Court. On the request to amend infringement contentions, the time to do that has long past and no good cause has been shown to allow amendment. Mailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS

Walter Albecker,

Plaintiff(s),

v.

Contour Products, Inc.,

Defendant(s).

Case No. 09 C 631
Judge Edmond E. Chang

**JUDGMENT IN A CIVIL CASE**

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $ .

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: Judgment entered in favor of Defendant and against Plaintiff.

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☒ decided by Judge Edmond E. Chang on a motion for summary judgment.

Date: 1/6/2014

Thomas G. Bruton, Clerk of Court

\s\ Sandra Brooks, Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER ALBECKER, | ) | |
| | ) | No. 09 C 00631 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CONTOUR PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Walter Albecker filed this lawsuit against Contour Products, Inc. to enforce his U.S. Patent No. 5,836,653 ('653 Patent).[1] R. 1, Compl. Following claim construction, Contour has filed a motion for summary judgment of patent noninfringement. R. 128. For the reasons below, Contour's motion is granted.

### I. Background

This order assumes familiarity with the facts of the case, which are set out more fully in the Court's two claim construction orders. *See* R. 54, May 2010 Order; R. 125, September 2013 Order. For this Order, it is sufficient to say that the parties quarrel over limitation (c) in Claim 10 of the '653 Patent, which claims "a top cushion having an upper and lower portion secured to the face of the generally wedge shaped foundation." R. 46, Exh. A, '653 Patent col. 18 ll. 39-41. In the September 2013 Order, the Court denied Albecker's motion to reconsider the

[1]In this federal question case, the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

previously assigned judge's construction of this claim. The Court adhered to the May 2010 Order and construed "secured to" as "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." September 2013 Order at 17. That construction resolved the principal dispute in this case: whether Claim 10 is infringed by a one-piece chair with a top cushion that is "integral and continuous" with the foundation (as Albecker argued), or infringed only by a two-piece chair whose top cushion is physically attached or "secured to" the foundation (as Contour argued). *See id.* at 3. The prior order resolved this dispute in Contour's favor: Claim 10 (specifically, limitation (c)) is infringed only by a product with a top cushion and foundation—two separate pieces—physically attached or "secured to" to each other with attachment means. Accordingly, because Contour argues that Contour makes only one-piece chairs, Contour has moved for summary judgment on noninfringement.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). All facts, and any inferences to be

drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

In patent cases, "[s]ummary judgment is as available . . . as in other areas of litigation." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (internal quotation marks omitted). Summary judgment of literal noninfringement is proper when, construing the facts in a manner most favorable to the nonmovant, no reasonable jury could find that the accused products meet every limitation recited in the properly construed claims. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002). In other words, summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

## III. Analysis

In Contour's motion, Contour asserts that the accused chairs are one-piece chairs formed from an integral and continuous piece of foam, so there is no literal infringement of Claim 10, which (as construed by the previously assigned judge and by this Court) claims a chair made up of two pieces that are physically attached to each other.[2] *See* R. 129, Def.'s Br. at 4-5. In response, Albecker dedicated much of

[2]Contour, in anticipation of Albecker's response brief, also argues that the accused chairs do not infringe the '653 Patent under the doctrine of equivalents. *See* Def.'s Br. at 5-7. Because Albecker did not apply that legal doctrine in his response brief, only literal infringement is at issue.

his brief to pointing out the "manifest errors" in the September 2013 Order. *See* R. 132, Pl.'s Resp. Br. at 2-5. He also argues that Contour has failed to prove the invalidity of dependent Claim 11 in the '653 Patent. *See id.* at 7-8. Albecker concludes by contending that Contour's chairs literally infringe the '653 Patent because they have physical attachment means. *See id.* at 10-11. As discussed below, Albecker's arguments are meritless.

**A.**

First, in the response brief, Albecker continues to re-litigate claim construction despite this Court's instruction, during the October 30, 2013 status hearing, to respond to noninfringement under the construction that both the previously assigned judge and this Court has already issued. *See* R. 134, 10/30/13 Tr. 10:22-11:3. Albecker did not follow this instruction. For example, he asserts once more that his special definition of "top cushion" only applies to a top cushion that is integral and continuous with the foundation. *See* Pl.'s Resp. Br. at 3-5. But he argued the same thing during the briefing of his motion to reconsider the Court's claim construction. *See* R. 68 at 3-4 ("This Court adopted the special definition for the 'integral and continuous top cushion 26s'—'the top 4" on the face of the foundation.' The context under which the Court adopted this definition, and the definition itself clearly includes the integral and continuous top cushion."). In the same vein, he again says that, during the patent's prosecution, the Patent Examiner telephoned Albecker with a determination that Claim 10 was generic, thus reinstating several withdrawn claims; this too is a repeat of a reconsideration

argument. *Compare* Pl.'s Resp. Br. at 2-3 ("The examiner called specifically addressing Claims 1 and 4 which were directed to non-elected species and had been withdrawn from consideration until a generic claim was held allowable . . . . The only reasonable inference to be drawn from the examiner's actions on the record, is that he did find claim 10 to be generic . . . ."), *with* R. 86 at 2-4 ("Thus, the examiner called . . . pursuant to MPEP 809.02 to advise Plaintiff that generic claims were found to be allowable in substance, and that the claims drawn to the non-elected species were no longer withdrawn."). The September 2013 Order, which denied Albecker's motion to reconsider claim construction, already rejected both of these arguments, *see* September 2013 Order at 7-8, 9 n.2, but he raises them yet again. The Court already gave Albecker two bites at the claim-construction apple; nothing justifies a third, especially after Albecker was expressly told to respond to noninfringement only. Because the time for claim construction—and *reconsideration* of claim construction—has already come and gone, the Court will not depart from its construction.

**B.**

Second, Albecker contends that Contour has failed to prove the invalidity of dependent Claim 11 in the '653 Patent. *See* Pl.'s Resp. Br. at 7-8. But Contour has moved for a judgment that its products do not infringe Claim 10 of the '653 Patent. Contour's motion does not assert the affirmative defense that Claim 11 is invalid, not even in the alternative. *Cf. Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1280 (Fed. Cir. 2012) ("Sun Life's alternative assertion

of noninfringement does not detract from its affirmative defense of invalidity . . . ."). Indeed, invalidity and noninfringement are separate legal principles (legal judgments, to be precise); the former sweeps broader than the latter. *See Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1132 (Fed. Cir. 2013) ("We have held that a judgment of invalidity is broader than a judgment of noninfringement."); *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed Cir. 2004) ("[A] determination of infringement applies only to a specific accused product or process, whereas invalidity operates as a complete defense to infringement for any product, forever." (internal quotation marks omitted)). Because Contour has moved only for a judgment of noninfringement on Claim 10, the invalidity of Claim 11 is not disputed here.

C.

Finally, Albecker does make one argument actually responding to the merits of noninfringement. He joins issue with Contour over limitation (c) in Claim 10, which, to repeat, claims "a top cushion having an upper and lower portion secured to the face of the generally wedge shaped foundation." '653 Patent col. 18 ll. 39-41. Remember, this Court construed "secured to" as "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." September 2013 Order at 17. From what this Court can glean from Albecker's response brief and the attached materials, he appears to argue that Contour's products infringe on Claim 10 because they feature attachment means that hold the chair together. *See* Pl.'s Resp.

Br. at 10-11. Specifically, Albecker appears to believe that Contour's chairs infringe the '653 Patent because they are one-piece chairs that are held together by both adhesive and mechanical attachment means: polyurethane foam and tensioned and zippered upholstery covers. *See* 10/30/13 Tr. 10:1-9; R. 132, Pl.'s Exh. 2, Albecker Aff. ¶¶ 7-15.

Albecker's argument fails in light of the Court's claim construction orders, which expressly held that the limitation (c) of independent Claim 10 is satisfied only by the physical attachment of *two separate pieces* with attachment means, thus securing them together. For example, in the original May 2010 Order, the previously assigned judge adopted Contour's proposed construction of "secured to," which precluded a construction permitting a one-piece product. *See, e.g.*, May 2010 Order at 10, 14, 16. And the Court's September 2013 Order adhered to that construction. In fact, the September 2013 Order rejects, in numerous places, the notion that a one-piece chair can satisfy limitation (c) in Claim 10. *See, e.g.*, September 2013 Order at 8 ("Albecker himself suggests that in the other embodiments the top cushion and foundation are normally *not* made of the same material, and instead must be secured to each other with a means of physical attachment."); *id.* at 14 ("These different claims use 'secured' in the context of affixing physically separate pieces to each other, rather than describing a single 'integral and continuous' piece."); *id.* at 15 ("The specification therefore uses 'secured to' when describing the seat cushion and the foundation as two separate pieces that are physically attached to each other with straps or other attachment

means."); *id.* at 16 ("Thus, no matter which piece the specification discusses—the top cushion itself, the seat cushion, the head pillow, or the cushion's upholstery—it teaches the physical attachment of that separate piece to each other or to the foundation, thus securing the pieces together."); *id.* at 17 ("By explicitly differentiating between 'a top cushion secured to the face of the foundation' and 'a pillow with a cover' or a 'single pillow structure,' the PTO therefore understood Albecker to be claiming a two-piece invention (with the seat cushion and foundation physically attached together) rather than a one-piece invention."). Under the Court's claim construction, the simple presence of attachment means on a one-piece chair does not satisfy limitation (c) of Claim 10.

And critically, Albecker has no rebuttal to Contour's record evidence that its chairs are, and always have been, one-piece chairs that have a top cushion that is unitary and continuous with the foundation. R. 126-2, Def.'s Exh. B-1, Davis Decl. ¶ 5. In fact, Albecker already has conceded as much. During the *Markman* hearing, Albecker agreed with the Court that his patent claim was "doomed to failure" if "secured to" did not mean "integral and continuous." R. 59, 3/11/10 Tr. 10:1-5. During the subsequent October 30, 2013 status hearing, Albecker again conceded that the accused products are one-piece products. 10/30/13 Tr. 9:13-18. And in his own affidavit filed in response to Contour's summary judgment motion, Albecker averred that Contour's chairs have a foundation and top cushion that are "comprised entirely of flexible polyurethane foam" with an "integral and continuous top cushion" that "will not come loose without tearing or cutting." Albecker Aff. ¶ 6.

So Albecker himself admits that the accused chairs are made up of one piece, rather than two pieces attached to each other with attachment means.[3] With that admission, there is no genuine issue of material fact whether Contour's accused chairs satisfy Claim 10. Under the Court's construction of Claim 10, they do not. No reasonable jury could find that the accused chairs infringe on the '653 Patent, so Contour is entitled to summary judgment.

## IV. Conclusion

For the reasons above, Contour's motion for summary judgment on noninfringement [R. 128] is granted. Judgment shall be entered for Contour and against Albecker.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 6, 2014

[3]This admission makes clear that the polyurethane foam, rather than being the attachment means of two separate pieces, is really part of a single "unitary and continuous" piece. And the same goes for the zippered upholstery cover: the cover might compress the chair when fully zipped up, *see* Albecker Aff. ¶¶ 13-15, but the chair is still concededly one piece even when enclosed.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.1**
**Eastern Division**

Walter J Albecker

Plaintiff,

v.

Case No.: 1:09−cv−00631
Honorable Edmond E. Chang

Contour Products, Inc. (FL), et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 21, 2014:

MINUTE entry before the Honorable Edmond E. Chang: Plaintiff's motions to alter or amend judgment [137] and to amend infringement contentions [137] are denied. On the request to alter or amend judgment, the motion repeats rejected arguments, both by Chief Judge Castillo and this Court. On the request to amend infringement contentions, the time to do that has long past and no good cause has been shown to allow amendment. Mailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER ALBECKER, | ) | |
| | ) | No. 09 C 00631 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CONTOUR PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Walter Albecker filed this lawsuit against Contour Products, Inc. to enforce his U.S. Patent No. 5,836,653 ('653 Patent) and to seek a declaration that U.S. Patent No. 6,823,545 ('545 Patent), owned by Contour, is invalid.[1] R. 1, Compl. The '653 Patent describes wedge-shaped backrest and legless leisure-chair designs that support the sitter's lower back by maintaining the back's lumbar region in a natural curve. R. 54, Claim Constr. Order at 2. In July 2009, the previously assigned judge denied Contour's motion to dismiss the declaratory judgment count for lack of subject matter jurisdiction. R. 26. And in May 2010, after claim construction briefing by both sides, the previously assigned judge issued an order construing certain disputed terms contained in Claim 10 of the '653 Patent. Claim Constr. Order at 7-18. Albecker now seeks reconsideration of the claim construction, R. 57, while Contour seeks reconsideration of the denial of its motion to dismiss, R. 60. For the reasons explained

[1] In this federal question case, the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

more fully below, Albecker's motion for reconsideration [R. 57] is denied and Contour's motion [R. 60] is granted.

## I. Background

In January 2009, Albecker filed a complaint against Contour Products, accusing Contour of producing and selling chairs that infringe Albecker's '653 Patent. *See* Compl. ¶¶ 5, 8-9. The '653 Patent describes wedge-shaped backrests and legless leisure chairs for sitting on the floor or on a bed and are designed to maintain the lumbar region of the sitter's back in a relatively natural lordotic curve. R. 46, Exh. A, '653 Patent at 1. The only issue on the table right now is Claim 10 of the patent, which describes a backrest/leisure chair comprising:

> (a) a relatively firm generally wedge shaped foundation having a face, a base, a back and two generally triangular sides, with the base being positioned parallel to a horizontal plane such as a floor or bed, and the face being oriented at an acute angle relative to both the base and the horizontal plane to define a generally wedge shape, wherein said face has an upper portion and a lower portion, wherein said upper portion has an average general pitch relative to the horizontal plane and said lower portion base an average general pitch relative to the horizontal plane, and wherein said face further has a contour which orients the average general pitch of upper portion of the face at a greater incline than the average general pitch of the lower portion;
>
> (b) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and
>
> (c) a top cushion having an upper and lower portion *secured to* the face of the generally wedge shaped foundation.

*Id.* col. 18 ll. 15-41 (emphasis added).

At the core of the parties' dispute is the last paragraph of Claim 10, limitation (c). After considering each side's proposed claim constructions, the previously assigned judge issued an order construing the following disputed claim terms in the following ways:

1.  "Top cushion" refers to "the top 4" of material on the face of the foundation or the cushioning material on the face of the foundation." Claim Constr. Order at 13.

2.  "Secured to" means "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." *Id.*

3.  "Face of the generally wedged shaped foundation" is "the top surface of the wedge shaped foundation." *Id.* at 14.

It is the second term, "secured to," that Albecker continues to contest. Essentially, by construing "secured to" as "attached using attachment means," the Court held that limitation (c) is satisfied *not* by a one-piece product with a top cushion that is "integral and continuous" with the foundation, but by a two-piece product whose top cushion is physically attached or "secured to" the foundation. Claim Constr. Order at 13. In light of that construction, Albecker now moves to reconsider, asserting that "secured to" should simply mean "attached to" with no reference to attachment means. *See* R. 58, Pl.'s Br. at 2. Thus, Albecker believes that "secured to" encompasses both one- and two-piece products.

For its part, Contour independently moves to reconsider the previous denial of the motion to dismiss the declaratory judgment count in Albecker's complaint. In its brief, Contour asserts that this Court lacks subject matter jurisdiction to declare

Contour's '545 Patent invalid under the Declaratory Judgment Act, 28 U.S.C. § 2201, because there is no case or controversy over the '545 Patent. R. 61, Def.'s Br. at 4-8.

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) states that a court may reconsider an interlocutory ruling "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed R. Civ. P. 54(b). Motions for reconsideration serve the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (citation omitted). Thus, a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). But a motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted).

In the context of claim construction, a motion for reconsideration may be raised at any stage of the case. *See, e.g., Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (after preliminary injunction ruling); *Bone Care Int'l LLC v. Pentech Pharm., Inc.*, 2010 WL 3023423, at *1 (N.D. Ill. July 30, 2010). Indeed,

the Federal Circuit has noted that "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman*, 302 F.3d at 1361 (citation omitted). Still, there must be some reason, whether factual or legal, to reconsider a construction.

## III. Analysis

### A. Albecker's Motion to Reconsider

Albecker moves to reconsider the Court's prior construction of limitation (c) of claim 10. Specifically, he disputes the construction of the term "secured to," which the Court interpreted as "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." Claim Constr. Order at 13.

Generally, when construing claim terms, courts should look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (internal quotation marks and citations omitted). Out of these sources, the intrinsic evidence (which includes the patent claims, specification, and prosecution history) is key to determining the meaning of a disputed term. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

Although Albecker tries to use intrinsic evidence in arguing the reconsideration motion, none of the arguments justify changing the construction. First, he asserts that

the Court's construction of "secured to" excludes all embodiments made with an injection-molding manufacturing process, thus impermissibly importing process limitations. *See* Pl.'s Br. at 7-8. As a procedural matter, this argument is rejected because it was previously raised during the initial round of claim-construction briefing, *see* R. 45 at 8-9, and thus rehashing it is not a proper argument for a motion to reconsider. Albecker's argument also fails on the merits. It fails as a matter of law, because the case that he relies on—*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008)—reasoned that courts must generally take care not to import process limitations from process *claims* into apparatus *claims*, *id.* at 1344,but *all* of Albecker's claims are apparatus claims. Because there are no process claims in this case, *Baldwin*'s concern about impermissible importing from claim to claim does not directly apply. Albecker's argument also fails as a factual matter, because although the specification does teach injection molding as a way to make a "high firmness support foundation," *see* '653 Patent col. 13 ll. 17-39, the specification also teaches using "firm internal support members to provide the equivalent of a relatively firm foundation," and even explicitly refers to this method as "[a]nother way to make an embodiment." *Id.* col. 13 ll. 40, 42-44. Indeed, in discussing this production method, the specification even instructs that "[t]he soft wedge shaped foundation and top cushion could be made in one piece *or made of two pieces* in a manner similar to that shown for Figs. 3A and 3B,"*id.* col. 13 ll. 48-51 (emphasis added), which means that the Court's construction of "secured to"—which requires the use of physical attachment means—does not rule out production methods.

Second, Albecker points to his patent-specific definition of the term "top cushion" ("the top 4" of material on the face of the foundation is considered to be the top cushion"), which the Court adopted in its claim construction. *See* '653 Patent col. 10 ll. 8-12. Because this definition appears in the section of the specification discussing the embodiment disclosed in Figure 1E—which has a top cushion that is integral and continuous to the foundation—Albecker believes that a construction of "secured to" requiring the use of a means of physical attachment contradicts his patent-specific definition of "top cushion." Pl.'s Br. at 8-9. Again, Albecker made this argument in his opening claim-construction brief. *See* R. 45 at 11. Even if the Court were to reconsider an already-made argument, the argument still fails. Yes, Albecker may act as his own lexicographer. *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed Cir. 2003) (citations omitted), but Albecker's definition of "top cushion" is not explicitly limited to an embodiment consisting of a foundation with an integral and continuous top cushion. Despite the definition's location in the specification, nothing in the definition suggests that it only applies to claims reading on that embodiment and not to claim 10. Rather, the definition, by its own terms, applies generally "[f]or the purposes of the claims," '653 Patent col. 10 ll. 8-9, which naturally includes claim 10. And more importantly, Albecker qualified his definition with this clause: "and though it may technically [sic] the same material, it is considered as a *foundation* with a top cushion." *Id.* col. 10 ll. 10-12 (emphasis added). By taking pains to point out that this particular embodiment still has a foundation and a top cushion *although* the pieces are made of the same material, Albecker himself suggests that in the other

embodiments the top cushion and foundation are normally *not* made of the same material, and instead must be secured to each other with a means of physical attachment. Instead of contradicting the Court's construction of "secured to," therefore, the Court's construction of "top cushion" actually supports it.

Albecker's third argument, however, does get some traction—though ultimately not enough to change the construction. Albecker contends that the Court's construction of "secured to" excludes the embodiment disclosed in Figure 1E, which describes a one-piece product with a top cushion that is integral and continuous with the foundation, *see* Pl.'s Br. at 3-6, and a claim construction that excludes embodiments disclosed in the specification is usually wrong, *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed Cir. 2002) (citation omitted). In response, Contour asserts that the Court's construction of "secured to" does not impermissibly exclude disclosed embodiments because Albecker withdrew his one-piece product claims in favor of prosecuting a two-piece species of invention in response to a restriction requirement issued by the Patent and Trademark Office (PTO). *See* R. 84 at 3-11.

In reply to Contour's argument, Albecker argues that the PTO did not actually issue a restriction requirement. Contrary to Albecker's belief, however, the prosecution history does show that the examiner issued a restriction requirement. Specifically, after Albecker submitted his initial patent application, the examiner issued an Office Action in July 1996 that listed a variety of distinct species in Albecker's application and required him to "elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable.

Currently, no claim is generic." R. 84-2, Def.'s Exh. A at 72, 73. In response to the PTO, Albecker elected "the species shown in FIG.s 1A-C" (the figures disclose a chair with a *separate* foundation and top cushion), selected numerous claims that read on those species, and withdrew the other claims from consideration. '653 Patent figs. 1A-C; Def.'s Exh. A at 74; *see also* Def.'s Exh. A at 78-79 (listing claim 12 as withdrawn from consideration because it was drawn to a non-elected species). Albecker elected this species without "traversing," or disputing, the examiner's election requirement. *See* Def.'s Exh. A at 79 ("Election was made *without* traverse . . . ."); *see also* MANUAL OF PATENT EXAMINING PROCEDURE § 818.03 (laying out the requirements to traverse). The claims that Albecker withdrew included the new claim 11 that describes a one-piece chair with a top cushion that is integral and continuous with the foundation. *See* '653 Patent col. 18 ll. 42-44. Although Albecker asserted that claims 11 and 21 (the claims that would become claims 10 and 20 in the '653 Patent) are generic, the record does not show that the examiner ever agreed.[2] Thus, all of the withdrawn claims—including the new claim 11—remained withdrawn after the application's restriction. 37 C.F.R. § 1.146; *St. Jude Med., Inc. v. Access Closure, Inc.*, — F.3d —, 2013 WL 4826148, at *7 (Fed. Cir. Sept. 11, 2013) ("Since no generic claim was applied for, and no such claim

---

[2]Albecker appears to allege that he discussed the withdrawn claims with the examiner by phone, *see* R. 86 at 2-4, but the examiner's Interview Summary only discloses that claims 1, 4, 11, and 21 were discussed and that "[s]ome changes were agreed upon to better define the claims over the prior art, and an amendment will be faxed for further consideration." Def.'s Exh. A at 93. The examiner never recorded that he discussed Albecker's withdrawn claims at all. Nor did Albecker ever file his own summary of that interview in his prosecution history file. Thus, there is no evidence in the documentary record that the examiner ever orally agreed that the withdrawn claims could be reinstated, or that the examiner ever orally found that any claim was generic.

was finally held allowable, that is what occurred: the election of species in the grandparent created a *restriction*."). Ultimately, Albecker, in the eyes of the PTO, did not pursue a one-piece invention.[3]

But just because Albecker elected—in response to an unexplained restriction requirement—a two-piece species rather than a one-piece species does not necessarily mean that, as a matter of law, Albecker purposely *chose* to claim solely a two-piece invention and disclaim a one-piece invention. The Federal Circuit has very recently cautioned courts from concluding that a patentee has disclaimed claim-scope simply by withdrawing certain claims after receiving an unexplained restriction requirement imposed by the PTO. In *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed Cir. 2013), Plantronics received a patent for a "concha-style" cell phone headset. *Id.* at 1346. After Plantronics sued Aliph for infringement, the district court construed certain stabilizers in the headset claims as requiring "elongated" structures and granted summary judgment to Aliph. *Id.* at 1348-49. On appeal, Aliph pointed to the prosecution history to argue that the district court properly construed the stabilizers as requiring elongated structures and not arch-shaped or torus-shaped structures. *Id.* at 1350. During prosecution, the PTO issued a restriction requirement in which the examiner instructed Plantronics to elect one of four distinct inventions or species (at least the

---

[3]To the extent that Albecker argues that his withdrawn claims were rejoined under the PTO process of rejoinder, rejoinder only allows applicants to present claims "directed to the process of making and/or using the patentable product." MANUAL OF PATENT EXAMINING PROCEDURE § 821.04. But Albecker's withdrawn claim 11 is a product claim, not a process claim, so rejoinder does not apply. And even if it did apply, there is again no record evidence that claim 11 or any other claim reading on the embodiment disclosed in Figure 1E was ever rejoined, or was "fully examined for patentability in accordance with 37 C.F.R. § 1.104." *Id.*

PTO believed them to be distinct). *Id.* Specifically, the PTO directed Plantronics to elect "a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable," and also contemporaneously stated that the application presented no "generic claim" covering more than a single species of the invention. *Id.* (internal quotation marks omitted). In response, Plantronics elected, without traverse, to prosecute only the first species, indicated which claims read on that species, and contended that one of those claims was generic. *Id.* That species happened to have elongated stabilizers. *See id.* Based on this prosecution history, Aliph contended that the claim construction was properly limited to the single invention depicting a single embodiment having one elongated stabilizer because Plantronics elected to pursue that invention rather than an invention with stabilizers of different shapes. *See id.*

The Federal Circuit rejected this argument. It reasoned that the PTO's restriction requirement provided no explanation why the inventions differed such that they were patentably distinct, let alone explained more specifically what difference arose from one invention having an elongated stabilizer and not an arch stabilizer. *Id.* at 1351. In fact, the Federal Circuit noted that more than one of the PTO's listed species contained elongated stabilizers, which refuted Aliph's contention that the PTO's restriction requirement was based on that structural difference. *Id.* And although Plantronics elected the first species without traverse, Plantronics did disagree with the PTO by saying, in the response to the PTO, that one of the claims was a generic claim that read on all of the embodiments illustrated in the application.

*Id.* Because of this ambiguous prosecution history, the Federal Circuit held that Plantronics did not disclaim its non-elongated-stabilizer inventions during prosecution: "The election of an invention in response to an ambiguous restriction requirement in turn cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim." *Id.* (citation omitted).[1]

*Plantronics* undermines Contour's argument that Albecker intentionally disclaimed a one-piece chair in the prosecution history. Here, the PTO required Albecker to elect one of nine different species of inventions to pursue, using nearly identical language to that used in *Plantronics*. *Compare id.* at 1350 ("Accordingly, the PTO directed Plantronics to elect 'a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable.' The PTO also concluded that the application presented no 'generic claim' covering more than a single species of the invention." (citation omitted)), *with* Def.'s Exh. A at 72 ("Applicant is required . . . to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, no claim is generic."). The PTO never explained to Albecker what distinguished each of the nine species from each other, making its

[1]*Plantronics*' holding does drive home how important it is for the PTO to explain, as much as practicable (the PTO's workload is enormous), the grounds for restriction requirements and the reasons why the examiner believes that the proposed claims set forth patentably distinct inventions. Under *Plantronics*, when the restriction requirement is not explained, an inventor can avoid disclaimer by simply noting bare-bones disagreement with the examiner's opinion that no claims are generic. The prosecution then moves on with the possibility that the examiner and the inventor have fundamentally different views of the scope of the claims and the probability that the public-information function of the patent is impaired.

restriction requirement just as ambiguous as *Plantronics*'. Indeed, a review of the figures disclosing the nine different inventions delineated by the PTO reveals that some of the unelected embodiments *also* have a foundation and cushion that are physically separate pieces, which likewise refutes Contour's contention that the PTO distinguished the inventions by their number of components. *Compare* '653 Patent fig. 1D, *with id.* fig. 1E. If the examiner had a one-piece versus two-piece distinction in mind, the examiner did not communicate that reasoning to Albecker. And just like in *Plantronics*, despite electing the first species without traverse (that is, without objection), Albecker disagreed with the PTO by responding that two of his claims were generic. *See* Def.'s Exh. A at 74. So Albecker did not fully accede to the PTO's findings either. Under *Plantronics*, then, this Court cannot draw the conclusion that Albecker's election of species represented a clear and unambiguous choice to pursue a two-piece invention specifically instead of a one-piece invention. *See* 724 F.3d at 1351. And that means that this Court may not so lightly dismiss the fact that its construction of "secured to" excludes the unelected embodiment depicted in Figure 1E.

But a claim construction that excludes a preferred embodiment—if Figure 1E is preferred—may still be correct if there is highly persuasive evidentiary support for that construction. *Rheox*, 276 F.3d at 1327 (internal quotation marks and citation omitted). And the bulk of the intrinsic evidence supporting the Court's prior construction of "secured to" (remember that the term refers to "attached using attachment means, such as an adhesive or mechanical type fasteners") rises to that

level. First, the term "secured to" is used several times throughout the claim language to refer to the physical attachment of two separate pieces. *See* '653 Patent col. 18 ll. 1-3 ("The backrest/leisure chair of claim 1 further including a seat cushion having an attachment means secured to the lower portion of the foundation . . . ."); *id.* col. 18 ll. 12-14 ("[W]herein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation."); *id.* col. 19 ll. 3-5 ("The backrest/leisure chair of claim 10 further including a seat cushion having an attachment means secured to the lower portion of the foundation . . . ."); *id.* col. 19 ll. 14-16 ("[W]herein the pillow has an attachment means to secure it near the top of the generally wedge shaped foundation."). These different claims use "secured" in the context of affixing physically separate pieces to each other, rather than describing a single "integral and continuous" piece. Because a claim term should be construed consistently with its use in other claims, *Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1299 (Fed. Cir. 2011) (citation omitted), the '653 Patent's claim language supports the construction of "secured to" as requiring attachment means, such as physical fasteners.

The specification, which is "the single best guide to the meaning of a disputed term," *Vitronics*, 90 F.3d at 1582, also repeatedly uses "secured to" to describe the physical attachment of separate pieces to each other. For example, in referring to the attachment of the seat cushion to the foundation—the key disputed language in claim 10—the specification instructs, "Unlike the head pillow straps mentioned above, this upholstery attachment means 35 or a similar means of securing the seat cushion 34 to the foundation 42 are essential to the proper working of . . . this embodiment." '653

Patent col. 8 ll. 27-30. And the specification further insists that the seat cushion be fastened tightly to the foundation with straps:

> Though the methods of securing the straps to the support foundation will vary with the type of material the support foundation is made of, the straps must be secured well enough to the support foundation to keep the seat cushion from moving away from the support foundation when a person is sitting on it.

*Id.* col. 10 l.64-col. 11 l.2; *see also id.* col. 10 ll. 61-64 ("The seat cushion 34 is attached to straps 35 or another suitable upholstery attachment means which would be secured either directly or indirectly to the high firmness support foundation."). The specification therefore uses "secured to" when describing the seat cushion and the foundation as two separate pieces that are physically attached to each other with straps or other attachment means. Similarly, the specification elsewhere uses "secured to" when teaching that the seat cushion and head pillow should be physically fastened to other parts of the chair. *See, e.g., id.* col. 8 ll. 54-58 ("The same type of technique could be used to close the bottom of the upholstery 30 on the top cushion 26—though it is not necessary that both the seat cushion 34 and top cushion 26 be secured together in this manner."); *id.* col. 10 ll. 59-61 ("In FIG. 2A the head pillow 32 is attached to straps for the head pillow 33 which are secured to the support foundation 42."). Likewise with the specification's description of the attachment of the upholstery to the foundation. *Id.* col. 12 ll. 26-28 ("The upholstery 30 is secured around the support foundation 42 and of course around the main cushion 26."). Thus, no matter which piece the specification discusses—the top cushion itself, the seat cushion, the head pillow, or the cushion's upholstery—it teaches the physical attachment of that separate

piece to each other or to the foundation, thus securing the pieces together. Indeed, the specification even goes so far as to explicitly *differentiate* between a foundation with a secured, or separate, top cushion, and a foundation with an integrated top cushion. *See id.* col. 6 ll. 48-50 ("This convex lumbar support can be integral and continuous with the foundation, *or* can be secured to the top of the lower portion of the foundation . . . ." (emphasis added)). Accordingly, the '653 Patent's specification also support the Court's construction of "secured to."

So do other parts of the '653 Patent's prosecution history. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citation omitted). During examination, in an October 1996 letter to Albecker, the patent examiner originally rejected what would become claim 10 on obviousness grounds, finding that adding "an overlying cushion member" for additional comfort was obvious in light of the prior art. *See* Def.'s Exh. A at 80. Thus, the PTO believed claim 10 to claim a foundation with an "overlying" seat cushion, which naturally suggests that claim 10 intended the foundation and seat cushion to be two separate pieces and not a single and continuous piece. And in an *ex parte* reexamination proceeding, the PTO found that the prior art did not anticipate a "top cushion secured to the face of the foundation" because the prior art teaches only "a pillow with a cover" and "a single pillow structure." R. 84-8, Def.'s Exh. F at 4, 5, 6. By explicitly differentiating between "a top cushion secured to the face of the foundation" and "a pillow with a cover" or a "single pillow structure," the PTO therefore understood Albecker to be claiming a two-

piece invention (with the seat cushion and foundation physically attached together) rather than a one-piece invention.

Despite the ambiguous restriction requirement, therefore, all signs but one point to the Court's previous construction of "secured to," which means "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." And the weight of this textual evidence—which is more useful than the prosecution history, *see Phillips*, 415 F.3d at 1317 (citations omitted)—means that Albecker has not carried the heavy burden that he must on motions to reconsider. *See Bank of Waunakee*, 906 F.2d at 1191. Accordingly, his motion is denied.

**B. Contour's Motion to Reconsider**

Contour separately moves to reconsider the Court's decision to deny its previous motion to dismiss the declaratory judgment count in Albecker's complaint for lack of subject matter jurisdiction. In Contour's view, that count seeks to declare Contour's '545 Patent invalid, yet the '545 Patent has nothing to do with this case, and more importantly there is no actual case or controversy over it. Def.'s Br. at 6-8.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Although an action for declaratory relief can itself be a case or controversy under Article III, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127-28 (2007) (internal quotation mark and citation omitted). In the patent-infringement context, a would-be declaratory judgment plaintiff (here, Albecker) who is not the patentee may satisfy Article III's case-or-controversy requirement by seeking a declaration of his legal rights without risking an infringement suit if the patentee "asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed Cir. 2007) (citation omitted). Put differently, "Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *Id.*

Contour has not put Albecker in that position. Albecker's complaint does not allege, for example, that Contour sent him a cease-and-desist letter that warned him to stop infringing its '545 Patent or else defend an infringement suit. *Cf. Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326-27 (Fed. Cir. 2002) (holding that the district court had subject matter jurisdiction despite the assertion of a defense of license where the patentee sent several cease-and-desist letters to the defendant and filed suit for infringement). Instead, Albecker alleges in his complaint that Contour's CEO, E. Scott Davis, told Albecker that "Contour Products had a patent on its product and, as a result, [Davis] did not understand why [Albecker] believed his patent had been

infringed." Compl. ¶ 19. But this allegation itself reads as merely a statement by Davis in response to allegations of infringement made by Albecker, which is a far cry from a *warning* by Davis that Albecker infringed Contour's '545 Patent. Indeed, "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1362-64 (Fed. Cir. 2009) (holding that declaratory judgment jurisdiction existed only because the patentee's letters to the plaintiff identified the patent as relating to a specific product line, imposed two-week deadlines to respond, and insisted that the plaintiff not file suit). Albecker's complaint, therefore, does not allege that Contour placed Albecker in a position where he could only choose between infringing Contour's patent or abandoning what he believed were legal rights.

Instead, now that this Court has denied Albecker's motion to reconsider its prior claim construction,[5] it is clear that the '545 Patent has no bearing on this case. Albecker's complaint alleges only that Contour infringed Albecker's '653 Patent. *See* Compl. ¶¶ 7-12. Thus, only the '653 Patent is at issue. It is significant too that Contour has not injected the '545 Patent into this case by asserting it as a defense, *see* R. 17,

[5]This decision is a new event that enables Contour to renew its motion to dismiss Albecker's declaratory judgment count by moving to reconsider. *See Rothwell Cotton Co.*, 827 F.2d at 251. Thus, Albecker's assertion that Contour cannot bring its motion because it lacks new evidence under Rule 60(b) is not well-taken, even if Rule 60(b) applied to motions to reconsider. *See* R. 63 at 9-10.

Def.'s Answer at 3-4, or as a counterclaim, *see id.* at 4-6 (counterclaiming only that Albecker's '653 Patent is invalid). Indeed, even when Contour previously sued Albecker in the Southern District of Florida (more on this below), Contour's complaint sought a declaration that it had *not* infringed Albecker's '653 Patent instead of a declaration that Albecker had infringed its '545 Patent. Complaint, *Contour Products, Inc. v. Albecker*, 08-cv-60575-WPD (S.D. Fla. Apr. 22, 2008), R. 1. The '545 Patent is not even invalidating prior art, because according to Albecker's complaint itself, Contour filed its '545 Patent after Albecker filed his '653 Patent. Compl. ¶ 21; *see also* R. 19 at 2 (stating that the '545 Patent has a filing date of May 16, 2003 and the '653 Patent has a filing date of June 19, 1995). When viewed from every angle, this case is about the '653 Patent, not the '545 Patent, so the Court has no subject matter jurisdiction to declare that the '545 Patent is invalid. *See SanDisk*, 480 F.3d at 1380-81 ("[D]eclaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement . . . .").

The only substantive argument that Albecker raises in response—that is not an argument about the previously assigned judge's case-management procedures, *see* R. 63 at 6-9, 13-14—is that Contour is judicially estopped from contesting subject matter jurisdiction because it previously argued that the Southern District of Florida had subject matter jurisdiction over its own declaratory judgment action. *See id.* at 11-12. "Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so."

*Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) (citation omitted). But as a threshold matter, the law is skeptical about allowing litigants to employ judicial estoppel to create subject matter jurisdiction when jurisdiction would otherwise not exist. *Lara v. Trominski*, 216 F.3d 487, 495 n.9 (5th Cir. 2000) ("We are especially wary of applying judicial estoppel to create subject matter jurisdiction in the federal courts." (citation omitted)); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Indeed, it has been cautioned that special care should be taken in considering whether judicial estoppel should even apply to matters affecting federal subject matter jurisdiction." (internal quotation marks and citation omitted)); *cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) ("When questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." (internal quotation marks and citation omitted)). After all, Contour and Albecker cannot waive arguments that the Court lacks subject matter jurisdiction and cannot stipulate between them that subject matter jurisdiction exists, *United States v. Cnty. of Cook, Ill.*, 167 F.3d 381, 387 (7th Cir. 1999), so any stance they previously took ought not to preclude them—or, more importantly, the Court—from reevaluating jurisdiction in the future. In any event, even if judicial estoppel did apply in this context, it requires that a litigant pursue a position that is "clearly inconsistent" with the position it asserted in prior litigation. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotations and citations omitted). As mentioned above, Contour previously asserted that the Southern District of Florida had subject matter jurisdiction to declare

that Contour had not infringed Albecker's '653 Patent. Pl.'s Opp'n to Def.'s Mot. Dismiss, *Contour Products, Inc. v. Albecker*, 08-cv-60575-WPD (S.D. Fla. Oct. 31, 2008), R. 13 at 2-9. That previous position is *not* clearly inconsistent with Contour's position now, which is that this Court lacks subject matter jurisdiction to declare that *Contour's* '545 Patent is invalid. Because this litigation involves a different plaintiff suing over a different patent and asserting a different doctrine of patent law, Albecker has not taken a clearly inconsistent position here. Judicial estoppel does not bar Contour's motion.[6]

Accordingly, because there is no case or controversy involving Contour's '545 Patent in this case, Albecker's declaratory judgment count is dismissed for lack of jurisdiction.

## IV. Conclusion

For the reasons explained above, Albecker's motion to reconsider [R. 57] is denied and Contour's motion [R. 60] is granted. Before the next status hearing, the parties shall confer and file a written status report expressing their respective positions on the case's appropriate next step. If Contour's product is a one-piece chair, then one possibility is for the Court to enter judgment for Contour, with Albecker preserving his objection to the claim construction and preserving his right to appeal it. The written status report is due by October 23, 2013. At the next status hearing on

---

[6]Albecker also asserts that Contour's motion is untimely under Rule 59(e), R. 63 at 9, but motions to reconsider are decided under Rule 54, which provides that interlocutory orders "may be revised *at any time* before the entry of a judgment." Fed. R. Civ. P. 54(b) (emphasis added).

October 30, 2013, the parties should be prepared to address the case schedule moving forward.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 27, 2013

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **WALTER ALBECKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 0631** |
| **v.** | ) | |
| | ) | **Judge Ruben Castillo** |
| **CONTOUR PRODUCTS, INC. (FL),** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Walter Albecker ("Plaintiff") filed this patent action against Contour Products, Inc. ("Defendant") for allegedly infringing upon United States Patent No. 5,836,653 (the "'653 Patent"). (R. 1, Compl. ¶ 8.) Plaintiff is seeking a declaratory judgment and other forms of relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. (*Id.* ¶ 13.) Presently before the Court are the parties' proposed constructions of the disputed claim terms.

**BACKGROUND**[1]

The '653 patent is a continuation-in-part of an application that issued as U.S. Patent No. 5,425,567 (the "'567 Patent"). (R. 47, Def.'s Mem., Ex. B at 1.) The application for the '653 patent, which was filed on June 19, 1995, contained three independent claims,[2] eighteen figures,

[1] Pursuant to Local Patent Rule 4.2(b), the parties were to submit a Joint Appendix containing the patents in dispute and the prosecution history for each patent. N.D. Ill. LPR 4.2(b). The Joint Appendix submitted in this case was deficient as it failed to provide the complete prosecution history. (*See* R. 46, Joint Appendix.) When referring to the prosecution history, the Court will therefore rely upon the appendix to Defendant's response brief.

[2] A claim is independent if it is completely self-contained. In contrast, a dependent claim contains a reference to a claim previously set forth and specifies a further limitation of the subject matter claimed. 35 U.S.C. § 112. A claim in dependent form incorporates all of the limitations of the claim to which it refers. *Id.*

and twenty-one total claims. (*See id.* at 1, 14-15.) In his application, Plaintiff describes his proposed invention as a generally wedge shaped backrest and legless leisure chair which orients the user's upper back at a higher angle than the user's lower back. (*See id.* at 42.) Notably, this product provided support for the user's lower back by maintaining the lumbar region of the user's back in a relatively natural lordotic curve. (*Id.*) Moreover, it also provided a seat cushion to prevent the user from slipping out of place. (*Id.*)

In July 2006, the United States Patent and Trademark Office ("USPTO" or "Office") examiner issued a communication indicating that the following nine categories of figures contained in Plaintiff's application constituted patentably distinct species of the claimed invention: (1) figures 1A-C; (2) figure 1D; (3) figure 1E; (4) figures 2A-D; (5) figures 2E-F; (6) figures 3A-C; (7) figures 4A-B; (8) figure 4C; and (9) figure 5. (*See id.* at 71-72.) Pursuant to 35 U.S.C. § 121, the USPTO required Plaintiff to "elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable."[3] (*Id.* at 72.) The Office then advised Plaintiff that a response to its letter must include an identification of the elected species and a listing of all claims readable onto the elected species. (*Id.*)

Plaintiff, in August 2006, sent the Office a letter indicating his election of figures 1A-C for prosecution on the merits. (R. 47, Def.'s Mem., Ex. B-1 at 74.) He further noted that the claims readable onto his election were claims 11, 13, 14, 16, 17, 18, 19, 20, and 21. (*Id.*) This letter also indicated that Plaintiff believed that claims 11 and 21 were generic. (*Id.*)

[3] The statutory basis for the restriction requirement provides: "[i]f two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions." 35 U.S.C. § 121.

Approximately four months later, the Office sent Plaintiff a second Office Action outlining its disposition of his claims. (*Id.* at 78.) First, the Office examiner, pursuant to 37 C.F.R. § 1.142,[4] withdrew claims 1-10, 12, and 15 from consideration because they were drawn to a non-elected species. (*Id.* at 79.) Next, the examiner rejected claim 21 as being indefinite for failing to particularly point out and distinctly claim the subject matter which Plaintiff regarded as his invention. (*Id.*) Finally, the examiner rejected claims 11, 13, 14, and 16-21 on obviousness grounds pursuant to 35 U.S.C. § 103(a) ("Section 103").[5] (*See id.*) Despite differing from the prior art in their addition of an "overlying cushion member," a "seat cushion," and a "separate legrest cushion," the examiner found that these claims were unpatentable because these changes would have been obvious in view of the prior art. (*Id.* at 79-81.)

Plaintiff sent the Office a letter in early 2007 in response to its disposition of his claims. (*Id.* at 84.) In his letter, Plaintiff made several changes and presented various arguments to overcome the USPTO's determinations. First, Plaintiff edited claim 21 to overcome the Office's indefiniteness determination. (*Id.* at 87-88.) Second, he amended claims 11 and 21 and, as a result of these changes, argued that his proposed invention cleared the Section 103(a) hurdle to patentability. (*Id.* at 88.) Specifically, he contended that his proposed invention overcame the

[4] The regulation states that "[c]laims to the invention or inventions not elected, if not canceled, are nevertheless withdrawn from further consideration by the examiner by the election, subject however to reinstatement in the event the requirement for restriction is withdrawn or overruled." 37 C.F.R. § 1.142(b).

[5] A patent may not be issued for a proposed invention if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

prior art by providing firm lumbar support.[6] (*Id.* at 88-89.) Finally, he provided additional arguments in which he presents reasons why portions of his proposed invention were not obvious extensions of the prior art. (*Id.* at 90-91.)

On March 5, 1997, Plaintiff was interviewed over the phone by the Office examiner. (*Id.* at 93.) During this interview, claims 1, 4, 11, and 21 were discussed. (*Id.*) Based on this conversation, Plaintiff faxed the Office a letter in which he requested several amendments to the specification and claims in his application.[7] (*Id.* at 95.)

About a week later, the USPTO sent a notice of allowability which noted that claims 1-3 and 5-22 were allowed. (*Id.* at 104.) That same day, the Office sent Plaintiff his notice of allowance and informed him that his application had been examined and allowed for issuance as a patent. (*Id.* at 105.) Plaintiff was issued the '653 Patent on November 17, 1998. (R. 46, Joint Appendix, Ex. A at 1.)

Plaintiff filed this action on January 30, 2009. (R. 1, Compl.) In his complaint, he alleges that Defendant has knowingly and actively induced or aided others in infringing the '653 Patent. (*See id.* at ¶ 8.) Specifically, according to Plaintiff, a patent owned by Defendant's CEO, U.S. Patent No. 6,823,545 (the "'545 Patent"), contains embodiments covered by the '653 Patent. (*Id.* at ¶¶ 17-22.) Thus, Plaintiff alleges that any products made and sold by Defendants which derive from the '545 Patent infringe his patent. (*Id.*) On July 17, 2009, Defendant filed a counterclaim seeking, among other forms of relief, a declaration stating that it has not infringed

[6] Plaintiff also differentiated prior art from his proposed invention by noting that the prior art did "not have a lumbar support that is generally uniform in cross section or that is shaped like a generally semi-elliptically shaped cylinder." (R. 47, Def.'s Mem., Ex. B-1 at 89.)

[7] In this set of amendments, Plaintiff cancelled claim 4. (R. 47, Def.'s Mem., Ex. B-1 at 98.)

the '653 patent. (R. 17, Def.'s Answer and Countercl. ¶ 14.)

In September 2009, the USPTO issued a communication in response to an ex parte patent reexamination proceeding initiated by Defendant. (R. 47, Def.'s Mem., Ex. G at 2.) After examining the '653 Patent against four primary references, the USPTO determined that the prior art of record failed to anticipate or render obvious claims 1-21 of the '653 Patent because it failed to teach all of the claim limitations of independent claims 1, 10, and 21. (*Id.* at 4.) The Office confirmed the patentability of the '653 Patent because the prior art failed to teach one or more of the following limitations: (1) a top cushion secured to the face of the foundation; (2) a convex contour support having firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; (3) an upper portion whose average general pitch is at a greater incline than the lower portion's average general pitch; and (4) a convex semi-elliptically shaped elongated cylindrical support extending substantially to a lower edge of the face of the foundation. (*Id.*)

On January 13, 2010, the Court ordered briefing by the parties on the proper construction of the disputed terms in the '653 patent. (R. 39, Min. Order.) In March 2010, the Court conducted a *Markman* hearing in which the parties had the opportunity to present their respective positions concerning what claim terms are disputed and how each should be construed. (*See* R. 52, Minute Entry.) Neither party presented witnesses at the hearing. (*Markman* Hr'g Tr. pgs. 1-2.)

## LEGAL STANDARD

An infringement action proceeds in two steps. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1281 (Fed. Cir. 2010). First, a court must engage in a claim construction

analysis to determine the meaning and scope of the patent claims asserted to be infringed. (*Id.*) The second step centers on a comparison of the properly construed claims to the device accused of infringing. (*Id.*) At this stage of the present infringement action, the Court focuses on the first step of the analysis.

In proceeding with a claim construction analysis, the Federal Circuit has made clear that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Thus, courts must begin their claim construction analysis with the words of the claim. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005). The words of the claim are generally given their "ordinary and customary meaning," which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id.* The person of ordinary skill in the art would view the claim term in light of the entire intrinsic record. *Id.* Thus, the claims "must be read in view of the specification, of which they are a part." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). Further, in addition to the words of the claim and the specification, the "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the court of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

In situations where the intrinsic record suffices to resolve any ambiguity in the disputed claim term, it is improper to rely on extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). If the intrinsic record fails to resolve ambiguities, a court can then rely upon extrinsic evidence, which "consists of all evidence external to the patent and

prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. The Federal Circuit has noted that while a court may consider extrinsic evidence, it has cautioned that "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." *Id.* at 1319.

## ANALYSIS

### I. Independent Claim 10 in the '653 Patent

Based on the representations made by the parties in their written submissions and during the *Markman* hearing, the Court finds that the contested terms contained in independent claim 10 are at the center of this dispute.[8] (*See Markman* Hr'g Tr. at pgs. 3-4, 26; R. 45, Pl.'s Mem. at 3 n.1; R. 47, Def.'s Mem. at 1-2.) Thus, the Court will focus its claim construction analysis on claim 10 and, specifically, limitation (c).[9]

Independent claim 10 reads as follows:

> 10. A backrest/leisure chair comprising:
>
> (a) a relatively firm generally wedge shaped foundation having a face, a base, a back and two generally triangular sides, with the base being positioned parallel to a horizontal plane such as a floor or bed, and the face being oriented at an acute angle relative to both the base and the horizontal plane to define a generally wedge shape, wherein said face has an upper portion and a lower portion, wherein said upper portion has an average general

[8] The parties have asked the Court to construe limitation (b) in independent claim 21, which states the following: "a top cushion having an upper and lower portion secured to the face of said generally wedge shaped foundation." U.S. Patent No. 5,836,653 col. 20 ll. 20-22 (filed Jun. 19, 1995). Since they contain the same operative language, the Court's construction of limitation (c) in independent claim 10 will also apply to limitation (b) in independent claim 21.

[9] The parties have also asked the Court to construe portions of limitations (a) and (b) in independent claim 10 and limitation (a) in independent claim 21. (R. 47, Def.'s Mem., Ex. A.)

pitch relative to the horizontal plane and said lower portion has an average general pitch relative to the horizontal plane, and wherein said face further has a contour which orients the average general pitch of upper portion of the face at a greater incline than the average general pitch of the lower portion;

(b) a means for supporting occupant's lumbar region in a relatively natural lordotic curve comprising a generally convex semi-elliptically shaped elongated cylindrical generally firm lumbar support on the lower portion of the relatively firm foundation and extending substantially to a lower edge of said face, said firm lumbar support having a firmness sufficient to generally maintain its convex shape when pressure from a reclining occupant leaning against the foundation is applied; and

(c) a top cushion having an upper and lower portion secured to the face of the generally wedge shaped foundation.

'653 Patent col. 18 ll. 15-41.

The crux of this dispute is the proper construction of limitation (c). According to Plaintiff, independent claim 10 not only claims two-piece products, but also unitary products wherein the top cushion is "integral and continuous" to the foundation. (*See* R. 45, Pl.'s Mem. at 2-5.) In support of his position, Plaintiff provides the following proposed constructions of the relevant language in limitation (c):

| Term | Plaintiff's Proposed Construction |
|---|---|
| "a top cushion" | Defined as "the top 4" of material on the face of the foundation." Alternatively, defines the term as "the cushioning material on 'the face of the foundation.'" |
| "secured to" | Defined as "generally fixed" or "firmly in position." |

| | |
|---|---|
| "the face of the generally wedge shaped foundation" | Defined as the sloped spatially defined surface of the "material" below "the top 4" of material on the face of the foundation." Also states that the "the face of the foundation" is the inclined portion of the foundation below where the "top cushion" meets the face of the foundation. Further, Plaintiff notes that this "surface or boundary may be defined by a seam or by a boundary where the top cushioning material is different from the foundation." |

(*Id.* at 3-14.)

Defendant contends that, as a result of limitation (c), independent claim 10 only claims two-piece products. (R. 47, Def.'s Mem. at 1.) Its proposed constructions of limitation (c) are as follows:

| Term | Defendant's Proposed Construction |
|---|---|
| "a top cushion" | Defined as "a separate cushion that is placed on top of the generally wedge shaped foundation and secured to its face using attachment means." |
| "secured to" | Defined as "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation." |
| "the face of the generally wedge shaped foundation" | Defined as "the top surface (face) of the foundation upon which a separate top cushion is to be secured." |

(*Id.* at Ex. A.)

With these proposed constructions in mind, the Court proceeds to applying the claim construction framework set forth by the Federal Circuit.

**A. Intrinsic Record of the '653 Patent**

**1. Claim language**

The claims themselves can "provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Indeed, the Federal Circuit has noted that the context in which a term is used in the asserted claim can be highly instructive. *Id.* Further, other "claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Id.*

The parties dispute the meaning of the claim term "secured to." According to Plaintiff, the term "secured to" in independent claim 10 is consistent with both a unitary and two-piece product. (*See* R. 51, Pl.'s Reply at 7-8.) For Defendant, the term's presence in claim 10 precludes a construction permitting a unitary product. (R. 47, Def.'s Mem. at 14.) Based on its reading of the relevant term, both in independent claim 10 and in other claims in the '653 Patent, the Court finds that its usage suggests that Defendant's proposed construction is proper.

Aside from its presence in limitation (c) and comparable usage in independent claims 1 and 21,[10] the term "secure" or "secured" is used four times throughout the '653 patent claims. *See* '653 Patent col. 18, ll. 2, 13; col. 19, ll. 4, 15. In each of those instances, the term is used to refer to the physical attachment of two separate pieces. For example, claims 7 and 20 use the term to note the physical attachment of two pieces: claim 7 describes "a seat cushion having an

[10] Limitation (b) in independent claim 1 provides for "a softer top cushion having an upper and lower portion secured to the face." '653 Patent col. 17, l. 35. Limitation (b) in independent claim 21 provides for a "a top cushion having an upper and lower portion secured to the face of said generally wedge shaped foundation." *Id.* at col. 20, l. 21.

attachment means secured to the lower portion of the foundation"; in claim 20, a "pillow has an attachment means to secure it near the top of the generally wedge shaped foundation." *Id.* at col. 18, l. 2; col. 19, l. 4. Thus, when used in other portions of the claims, the term "secure" or "secured" indicates a relationship whereby one piece is physically attached to another piece of the product. Because "[a] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent," *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), the Court finds that an examination of the claim language points in favor of Defendant's proposed construction of the term "secured to."[11]

Plaintiff provides one discernible claim-language based argument in support of his proposed construction. In his briefs, he contends that independent claim 10 includes a unitary product wherein a "top cushion is integral and continuous with the generally wedge shaped foundation" because "limitations in a dependent claim 'are implicitly permitted . . . by extension' in the independent claims from which they depend." (R. 45, Pl.'s Mem. at 6-8.) The Court finds this argument unpersuasive as it is unclear whether dependent claim 11 is a limitation or an extension of independent claim 10.[12]

**2. Specification**

The specification contains a "written description of the invention which must be clear and

[11] The Court notes that the parties did not provide any discussion regarding the meaning of the preposition "to" in the term "secured to."

[12] Plaintiff also invokes the doctrine of claim differentiation in support of his position. (R. 51, Pl.'s Reply at 7-9.) Under this doctrine, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Enzo Biochem. Inc. v. Applera Corp.*, No. 2009-1281, 2010 WL 1135563, at *14 (Fed. Cir. Mar. 26, 2010). This argument fails because it is unclear whether dependent claim 11 is indeed a limitation on independent claim 10.

complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics*, 90 F.3d at 1582. Thus, the Federal Circuit has noted that the specification is always highly relevant to the claim construction analysis. *Id.* Indeed, it is usually dispositive and is considered the single best guide to the meaning of a disputed term. *Id.*

Portions of the '653 Patent specification also support Defendant's proposed construction of the term "secured to." In the specification, the term "secure" or "secured" is used at various points. *See* '653 Patent col. 6, l. 50; col. 8, ll. 34, 36-39, 58; col. 10, ll. 60, 63, 67; col. 12, l. 27. Consistent with its usage in the claims, the use of the term in the specification indicates a relationship between two or more pieces. (*See id.*) Specifically, it suggests the physical attachment of two pieces. For example, the specification describes: a seat cushion designed to prevent the user from sliding down which must be "secured" directly or indirectly to the foundation "so that the user won't slide down and move the seat cushion while he or she slides down"; a head pillow attached to straps which are "secured to the support foundation"; and a piece of upholstery "secured around the support foundation and . . . around the main cushion." *Id.* at col 8, ll. 32-39; col. 10, ll. 59-61; col. 12, ll. 26-28.

Further, other portions of the specification also shed some light upon the meaning of the term "secured to." In describing the convex lumbar support in an embodiment depicted by figure 1A, the specification notes that it "can be integral and continuous with the foundation, *or* can be secured to the top of the lower portion of the foundation." *Id.* at col. 6, ll. 48-51 (emphasis added). The use of the term "or," which the Federal Circuit has noted indicates the presentation of alternatives unless given a different meaning, *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1330 (Fed. Cir. 2001), strongly suggests that the term "secured to" in independent

claim 10 cannot also mean "integral and continuous." As a result, this portion of the intrinsic record indicates that limitation (c) is satisfied not by a unitary "integral and continuous" product, but by a product whose separate pieces are attached, or "secured to," one another. Thus, the term's use in the specification–along with its usage in the claim language–leads the Court to adopt the following construction of the term "secured to": "attached using attachment means, such as an adhesive or mechanical type fasteners that might be used with material that is selected for the top cushion and foundation."

In his opening brief, Plaintiff argues that the construction of the term "top cushion" buttressed his understanding of independent claim 10. (R. 45, Pl.'s Mem. at 4-5.) Specifically, Plaintiff argues that he gave the term "top cushion" a special meaning that supports his proposed construction of limitation (c). (*Id.*) Indeed, the specification for the '653 Patent does provide a special meaning for the term "top cushion." '653 Patent col. 10, ll. 8-12 ("For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion and though it may be technically the same material, it is considered as a foundation with a top cushion."). Where an inventor has given a term a special meaning, the Federal Circuit has held that the "inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Defendant does not provide any argument grounded in the intrinsic record in opposition to Plaintiff's proposed construction of the term "top cushion." (*See* R. 47, Def.'s Mem.) Thus, the Court adopts the following construction for the term "top cushion" proposed by Plaintiff: "the top 4" of material on the face of the foundation or the cushioning material on 'the face of the foundation.'" (R. 45, Pl.'s Mem. at 4.)

While the parties contest the meaning of the terms "top cushion" and "secured to," they

fail to properly address the construction of another term they ask the Court to construe: "the face of the generally wedge shaped foundation." (*See* R. 45, Pl.'s Mem. at 14-15; R. 47, Def.'s Mem.) Based on its reading of the claims and specification, the Court construes "the face of the generally wedge shaped foundation" as meaning the "top surface of the wedge shaped foundation."

**3. Prosecution history**

The prosecution history consists of the complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317. Like the specification, the prosecution history provides evidence of how the USPTO and the inventor understood the patent. *Id.* The prosecution history can often inform the meaning of the claim language by "demonstrating how the inventor understood the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* When considering the prosecution history, a court may also look to reexamination proceedings for guidance. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004).

The prosecution history of the '653 patent supports the conclusion that limitation (c) is not satisfied by a unitary product with a top cushion that is integral and continuous with the foundation. In response to Plaintiff's election of species for prosecution on the merits, the Office Action rejected what would become claim 10 on obviousness grounds.[13] (R. 47, Def.'s Mem., Ex. B-1 at 79-80.) While noting that the prior art did not show an "overlying cushion member," the Office found that to have included such a member for support "would have been an obvious

[13] The communication from the Office indicates that claim 11 was unpatentable over the prior art. (R. 47, Def.'s Mem., Ex. B-1 at 79-80.) Claim 11 became independent claim 10 once claim 4 was cancelled.

modification to one with ordinary skill in the art." (*Id.* at 80.) Thus, in its comparison of the '653 application to the prior art, it is evident that the USPTO considered the proposed invention as consisting of a foundation with an "overlying cushion member." In his subsequent communications with the Office, Plaintiff did nothing to suggest that the cushion could have been alternatively "overlying" and "integral and continuous." The Court finds that the USPTO's apparent understanding of the '653 application is inconsistent with a reading of independent claim 10 which would claim a unitary product.

Similarly, the reexamination proceedings also suggest that the USPTO understood the '653 patent as a two-piece product. In the proceedings, the USPTO made clear that the prior art failed to anticipate or render obvious the claims in the '653 patent because, among other things, the prior art failed to teach a "top cushion secured to the face of the foundation." (R. 47, Def.'s Mem., Ex. G at 4.) While standing alone this statement is unhelpful, its meaning is clarified when understood in its context. Specifically, the USPTO found that the "top cushion" limitation allowed the '653 patent to overcome two references that only teach: (1) "a pillow with a cover"; and (2) "a single pillow structure." (*Id.* at 5-6.) Thus, in the reexamination proceedings, the USPTO compared the '653 patent to unitary "pillow" structures and found that it overcame prior art because it contained "a top cushion secured to the face of the foundation." (*Id.* at 4.) Based on its reading of the reexamination statement, the Court finds that the USPTO understood the '653 Patent as claiming a two-piece product.

Plaintiff argues that an interpretation of limitation (c) which would exclude disclosed embodiments describing a unitary product would run afoul of claim construction principles. (R. 51, Pl.'s Reply at 13.) Indeed, the Federal Circuit has noted that courts should avoid interpreting

"claim terms in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008). Interpretations of claim terms which exclude disclosed embodiments are acceptable, however, "where those disclosed embodiments are clearly disclaimed in the specification or prosecution history." *Id.* at 1277.

In this case, the Court's interpretation of limitation (c) would exclude the embodiment disclosed in figure 1E, which describes a unitary product wherein the top cushion is integral and continuous with the generally wedge shaped foundation. The Court's interpretation of the relevant claim terms is acceptable, however, because the excluded disclosed embodiments were subject to a restriction requirement by the USPTO, and thus not claimed by Plaintiff. In his response to the initial Examiner Action setting forth the restriction requirement, Plaintiff unambiguously elected the species shown in figures 1A-C–and not figure 1E–for prosecution on the merits. (R. 47, Def.'s Mem., Ex. B-1 at 74.) Because these disclosed embodiments were not elected by Plaintiff in proceeding with his application, the Court finds that its interpretation of limitation (c) does not impermissibly exclude disclosed embodiments.[14]

Accordingly, the Court finds that the prosecution history in this case supports the aforementioned constructions of the terms in limitation (c).

---

[14] Plaintiff argues that the embodiment in figure 1E was not subject to a restriction requirement because independent claims 10 and 21 were generic. (R. 45, Pl.'s Mem. at 10.) While the presence of a generic claim would have rendered the election of any disclosed species unnecessary, there is nothing in the record indicating that the USPTO believed that independent claims 10 and 21 were generic. The record does indicate that Plaintiff believed independent claims 10 and 21 were generic, but it does not indicate that the USPTO believed that they were. (R. 47, Def.'s Mem. at 74.) In fact, the record indicates that the examiner believed that no claim was generic. (*Id.* at 72.) Plaintiff points to no portion of the record suggesting that the USPTO found that the independent claims 10 and 21 were generic.

**B. Extrinsic evidence**

While extrinsic evidence can shed useful light on the relevant art, it is less significant than the intrinsic record in determining the legally operative meaning of claim language. *Phillips*, 415 F.3d at 1317. Where the intrinsic record suffices to resolve any ambiguity in the disputed claim term, it is improper to rely on extrinsic evidence. *Vitronics Corp.*, 90 F.3d at 1583. Here, Plaintiff uses extrinsic evidence in the form of unrelated patents to support his proposed construction of the term "secured to." (*See* R. 45, Pl.'s Mem. at 12-14; R. 51, Pl.'s Reply at 5-6.) Because the intrinsic evidence in this case resolves any ambiguity surrounding the disputed claim terms, the Court finds an examination of extrinsic evidence unnecessary.

**II. Other Disputed Terms in the '653 Patent**

The parties also dispute the meaning of several additional claim terms. (*See* R. 47, Def.'s Mem., Ex. A at 1-3.) Based on the representations made to the Court, this dispute centers on one question: whether limitation (c) in independent claim 10 is satisfied by a unitary product.[15] Because the Court finds that the construction of the terms "top cushion," "secured to," and "the face of the generally wedge shaped foundation" answer this central question, it will not proceed in construing any additional terms. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("Although patent claims are construed objectively and without reference to the accused device, only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")

[15] The parties have also noted that this dispute boils down to an interpretation of claim 10 and, specifically, limitation (c). (*See Markman* Hr'g Tr. at pgs. 3-4, 26; R. 45, Pl.'s Mem. at 3 n.1; R. 47, Def.'s Mem. at 1-2.)

**CONCLUSION**

The disputed terms are construed in accordance with the constructions set forth above. This lawsuit is set for a status hearing on May 19, 2010 at 9:45 a.m. to discuss the future status of this litigation. The parties should exhaust all settlement possibilities in light of this opinion.

**Entered:**

**Judge Ruben Castillo**
**United States District Court**

**Dated:** May 3, 2010

# Exhibit – C

**Excerpts from Prosecution History**

C-1 … PTO Office Action identifying withdrawn claims.
C-2 … PTO Examiner's Interview Summary.
C-3 … Changes to Specification Fig. 1E.
C-4 … Changes to FIG 1E.
C-5 … Amendment initialed by Examiner, accepting changes to FIG. 1E.

| **Office Action Summary** | Application No. 08/492,170 | Applicant(s) Albecker III |
| --- | --- | --- |
| | Examiner Peter Brown | Group Art Unit 3507 |

☒ Responsive to communication(s) filed on *Aug 26, 1996*.

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire *3* month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) *1-21* is/are pending in the application.

Of the above, claim(s) *1-10, 12, and 15* is/are withdrawn from consideration.

☐ Claim(s) ______ is/are allowed.

☒ Claim(s) *11, 13, 14, and 16-21* is/are rejected.

☐ Claim(s) ______ is/are objected to.

☐ Claims ______ are subject to restriction or election requirement.

**Application Papers**

☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on ______ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on ______ is ☐ approved ☐ disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) ______.

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: ______.

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of References Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). ______

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

*— SEE OFFICE ACTION ON THE FOLLOWING PAGES —*

U. S. Patent and Trademark Office
PTO-326 (Rev. 9-95) Office Action Summary Part of Paper No. 4



UNITED S[illegible] ES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 492170 | | | |

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 5 |

DATE MAILED:

## INTERVIEW SUMMARY

All participants (applicant, applicant's representative, PTO personnel):

(1) Walter Albecker (3) ____

(2) Peter Brau (4) ____

Date of Interview 3/5/97

Type: ☒ Telephonic ☐ Personal (copy is given to ☐ applicant ☐ applicant's representative).

Exhibit shown or demonstration conducted: ☐ Yes ☒ No If yes, brief description: ____

Agreement ☒ was reached. ☐ was not reached.

Claim(s) discussed: 1, 4, 11, 21

Identification of prior art discussed: art of record.

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:

Some changes were agreed upon to better define the claims over the prior art, and an amendment will be faxed for further consideration.

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

1. ☒ It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary. A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a response to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

2. ☒ Since the Examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action. Applicant is not relieved from providing a separate record of the interview unless box 1 above is also checked.

Examiner Note: You must sign this form unless it is an attachment to another form.

FORM PTOL-413 (REV. 1-96)

* U.S. GPO: 1996-410-232/40051

 

UNITED STA[illegible] DEPARTMENT OF COMMERCE
Patent and T[illegible]emark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/492,170 | 06/19/95 | ALBECKER | W |

35M1/0313

WALTER J ALBECKER
838 S MAY
CHICAGO IL 60607

EXAMINER: BROWN, P

| ART UNIT | PAPER NUMBER |
|---|---|
| 3507 | 10 |

DATE MAILED: 03/13/97

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

## NOTICE OF ALLOWABILITY

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

☑ This communication is responsive to amendment filed 3/6/97.

☑ The allowed claim(s) is/are 1-3, 5-22.

☐ The drawings filed on ______ are acceptable.

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) ______.

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: ______.

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

☑ Applicant MUST submit NEW FORMAL DRAWINGS

☑ because the originally filed drawings were declared by applicant to be informal.

☐ including changes required by the Notice of Draftperson's Patent Drawing Review, PTO-948, attached hereto or to Paper No. ____.

☐ including changes required by the proposed drawing correction filed on ______, which has been approved by the examiner.

☐ including changes required by the attached Examiner's Amendment/Comment.

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftperson.**

☐ Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). ______

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

☑ Interview Summary, PTO-413

☐ Examiner's Amendment/Comment

☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

☐ Examiner's Statement of Reasons for Allowance

**PETER R. BROWN**
**PRIMARY EXAMINER**
**ART UNIT 357**

PTOL-37 (Rev. 10/95)

* U.S. GPO: 1996-404-496/40507

would be the open or unfolded position, and for storage, could simply be folded over the pitched face of the foundation and top cushion. And for different preferences, the cushions could be reversed, with the buttocks and thigh cushion being sloped while the calf and foot cushion is generally rectangular.

FIG. 1E is a side view of an embodiment similar to the ones shown in FIG.s 1A-1D, but shown with the foundation 42s and top cushion 26s made out of the same material. In the drawing, 42s is a foundation that has an integral and continuous top cushion 26s on it or a top cushion made of the same type of material as the foundation. This could be done following principles discussed under FIG. 1A where the material is soft enough to be acceptable as a top cushion, but firm enough to support a human occupant. A polyurethane foam material with an ILD of about 35 pounds might be acceptable. As shown, the foundation 42s and top cushion 26s combination has a bend or curve as indicated by Cb that is less than 180 degrees in such a manner that the average general pitch of the slope of the upper portion U.P. is greater than the average general pitch of the lower portion L.P. For the purposes of the claims, the top 4" of material on the face of the foundation is considered to be the top cushion 26s, and though it may be technically the same material, it is considered as a foundation with a top cushion.

FIG. 2A is an isometric view of an embodiment of the present invention using a high firmness support foundation 42 made of styrofoam, polyurethane foam or the like. The main or top cushion 26 is shown clear in this drawing to show the support foundation 42. The support foundation 42 could be made from a variety of materials including a high firmness polyurethane foam, styrofoam, etc. which would be generally solid, or it can be made of something like fiberglass, plywood or a plastic wherein the top, sides, back and possibly the bottom are made of the material, but inside is generally hollow. In the drawing, the leisure chair is shown so it can be used in either a reclining position as shown, or in a more



WALTER J. ALBECKER
SHEET 3 OF 13

**Figure 1E**

U.P.
32
Cb
26s
44
L.P.
34
42s

C-4

126

IN THE US PATENT AND TM OFFICE

Appn. Number: 08/492,170
Filing Date: 06/19/95
Applicant: Walter J. Albecker III
Appn. Title: BACKRESTS/LEGLESS LEISURE CHAIRS MADE WITH A FOUNDATION
Examiner: Peter R. Brown/GAU 3507

REQUEST FOR APPROVAL OF PROPOSED DRAWING AMENDMENT

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Approved PB

Applicant respectfully requests permission to amend the drawings of the above application after allowance. The proposed changes are indicated on the red photocopies of FIG.s 1A - 1E, or sheets 1-3 thereof attached hereto.

REMARKS

Basically, two changes have been made. First, the lines A.L.P. and A.U.P. have been shortened on FIG. 1C in accordance with AMENDMENT B page 4 under "REMARKS – SPECIFICATIONS" which states in pertinent part: "It is not intended that the average pitch should take into account major variations from the preponderate pitch, especially of the kind which may be near the highest portion of the upper portion or the lowest portion of the lower portion. *When corrected drawings are submitted, FIG. 1C will have the*

*average pitch of the upper portion and lower portion in a way that may be less likely to be open to different interpretations.*" (Italics added for emphasis.)

Additionally, there has been a minor change/correction in the shape and angle of the pitched face of the foundation (42) with a resulting change on the top cushion (26) shown in FIG.s 1A - 1E. This change is consistent with the written specification beginning on page 11 line 15 which states in pertinent part: "The purpose of the convex curve 44 is to support the lumbar region of the user's back in a relatively natural lordotic curve. The lordotic curve is a normal curve in a human's lower back. Lumbar refers to the region of the spine where the lordotic curve is. *The convex curve 44 is shaped to roughly mirror a lordotic curve.*" (Italics added for emphasis.) Also, the written specification makes reference on page 14 beginning on line 17 states in pertinent part: "The general dimensions of a presently preferred embodiment are as follows: the foundation ... is ... approximately 22" to approximately 24" from front to back, ... and approximately 22" to approximately 24" from the base to the top ..." The new drawings are more consistent with the written specification, and more accurately reflect the preferred embodiment.

Very respectfully,

Walter J. Albecker III
Applicant Pro Se

838 South May
Chicago, IL 60607
(312) 243-5584
(708) 339-6318 (most days)

# Exhibit – D

**Excerpts from Davis' US Patent Appn. No. 11/399,739**

D-1  …  Cover Page.
D-2  …  Specification referring to "securing".
D-3  …  Specification referring to "attached to".
D-4  …  Amendment to PTO referring to "generic" claims.

US 20060255646A1

(19) **United States**

(12) **Patent Application Publication** (10) **Pub. No.: US 2006/0255646 A1**

**Davis et al.** (43) **Pub. Date: Nov. 16, 2006**

(54) **PORTABLE SUPPORT CUSHION**

(75) Inventors: **E. Scott Davis**, Ft. Lauderdale, FL (US); **Antonio Arcieri**, Ft. Lauderdale, FL (US)

Correspondence Address:
**AUFRICHTIG STEIN & AUFRICHTIG, P.C.**
**300 EAST 42ND STREET, 5TH FLOOR**
**NEW YORK, NY 10017 (US)**

(73) Assignee: **Banyan Licensing LC**

(21) Appl. No.: **11/399,739**

(22) Filed: **Apr. 7, 2006**

**Related U.S. Application Data**

(60) Provisional application No. 60/669,679, filed on Apr. 8, 2005.

**Publication Classification**

(51) **Int. Cl.**
*A47C 7/02* (2006.01)

(52) **U.S. Cl.** ........................................ **297/452.16**

(57) **ABSTRACT**

A body support cushion including a first section of the cushion for forming a portion of the surface of the cushion, adapted to shift from a flattened state to a flexed state and a second section of the cushion for forming another portion of the surface of the cushion, adapted to shift from a flattened state to a flexed state. A hinge couples adjoining edges of the first and second sections. A first coupling member on the first section is selectively, releasably coupled to a second coupling member on the second section to create a body support cushion in which the first and second sections are flexed which results in a body support cushion capable of moving from a flattened state to a flexed state. The body support cushion is particularly suitable for supporting a user's lower back when sitting in a chair. It is also suitable for supporting other body parts such as the knee, ankle or even the back when laying down. It can also be used to support a laptop computer or other object on one's legs or lap when sitting.

D - 1

[0018] FIG. 2 is a bottom plan view of the portable support cushion of FIG. 1;

[0019] FIG. 3 is a perspective view of the portable support cushion of FIGS. 1 and 2 in its flat position;

[0020] FIG. 4 is an enlarged partial side elevational view of the hinge of the portable support cushion of side elevational view of the body support cushion of FIG. 5;

[0021] FIG. 5 is a side elevational view of the portable support cushion of FIGS. 1-3;

[0022] FIG. 6 is a perspective view of the portable support cushion of FIG. 1 in a first adjustment point of its deployed position;

[0023] FIG. 7 is a side elevational view of the portable support cushion of FIG. 6;

[0024] FIG. 8 is a perspective view of the portable support cushion of FIG. 1 in a second adjustment point of its deployed position;

[0025] FIG. 9 is a side elevational view of the portable support cushion of FIG. 8;

[0026] FIG. 10 is a perspective view of the portable support cushion of FIG. 1 in a third adjustment point of its deployed position;

[0027] FIG. 11 is a side elevational view of the portable support cushion of FIG. 10;

[0028] FIG. 12 is a perspective view of the portable support cushion of FIG. 1 in a fourth adjustment point of its deployed position;

[0029] FIG. 13 is a side elevational view of the portable support cushion of FIG. 12;

[0030] FIG. 14 is a side elevational view of a portable support cushion in accordance with the invention supporting a user's back while seated in a chair;

[0031] FIG. 15 is a perspective view of the portable support cushion of FIG. 14 in use as in FIG. 14 with the portable support cushion shown in phantom;

[0032] FIG. 16 is a perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0033] FIG. 17 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0034] FIG. 18 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0035] FIG. 19 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0036] FIG. 20 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0037] FIG. 21 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention;

[0038] FIG. 22 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention; and

[0039] FIG. 23 is a further perspective view of a portable support cushion in accordance with another preferred embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0040] Reference is first made to FIGS. 1-5 wherein a portable support cushion generally indicated as 100 constructed in accordance with a preferred embodiment of the invention is depicted. Like elements are represented by like reference numerals. Portable support cushion 100 as seen in FIG. 5 is a flat, thin member, preferably injection molded out of a plastic material as a single, integral unit. In a current preferred embodiment portable support cushion 100 is used as a body support cushion in connection with a chair, as seen in FIGS. 14 and 15. The discussion will focus initially on the embodiment shown in FIGS. 1-5 particularly suitable for use as a body support cushion for providing back support as seen in FIGS. 14 and 15.

[0041] Support cushion 100 includes chair side cushion 101 and body side cushion 102 connected with a hinge 103. In a current preferred embodiment of the invention hinge 103 as best seen in FIG. 5 and the enlarged partial view of FIG. 4, is formed as a living hinge which is a reduced thickness portion of plastic which allows the two sections 101, 102 to rotate about the connecting line formed by hinge 103 but permanently securing the two sections 101, 102 together. The living hinge is formed in accordance with conventional technology dependent on the materials utilized, molding process and dimensions of the portable support cushion 100.

[0042] A series of engaging slots 104, 105 are found in chair side cushion section 101 and are adapted to receive tabs 106, 107 respectively in body side cushion section 102. The slots 104, 105 are preferably slightly angled as shown in the drawings and are preferably about 25 or 30 percent of the way in from each edge of section 101 to minimize distortion and provide a relatively uniform flexed contact surface. The engagement of tabs 106, 107 in one of the sets of slots 104, 105 allows the user to adjust the relative thickness and stiffness of the body support cushion 100 in its engaged or deployed state as shown in FIGS. 6-13. Each of the pairs of Figures, starting with FIGS. 6 and 7 and including FIGS. 8 and 9, FIGS. 10 and 11 and FIGS. 12 and 13 is a perspective view of one of the four different engagement points of the portable support cushion 200 and its corresponding side elevational view. Cushion 200 varies from Cushion 100 only by addition of two additional slots 122, 123. The variation in slots corresponding to the tabs allows the thickness and curvature of the portable support cushion to be adjusted so that it fits the intended need most closely. As seen in FIGS. 7, 9, 11 and 13, the thickness of the arc of body side cushion section 102 can be increased or decreased by selecting a different slot 104, 105 to engage tabs 106, 107.

[0043] Body side cushion section 102 is anticipated to both rest against the user's back or other body part and have the substantial bulk of the curvature in the engaged state. Holes 108 shown on body side cushion section 102 create air

D-2

holes which serve several functions. First, they allow air and heat to escape so that the use of body support cushion **100** does not cause the user's body to sweat excessively in the area of the body support cushion. In addition, they enhance the flexibility of the body side cushion section **102** so that when tabs **106**, **107** are engaged with slots **104**, **105**, more of the tension in the panels is converted into bending by the body side cushion section **102** than the chair side cushion section **101**. Another purpose is to reduce the overall weight of the body support cushion **100** so that during transportation in a briefcase or other transport device when not deployed, its weight is reduced. Curved slots **109**, **110** and straight slot **111** in body side cushion section **102** are used to enhance the flexibility of body side cushion section **102** further. They provide enhanced flexibility both parallel to hinge **103** and at varying angles through an angle perpendicular of hinge **103**. The slots can be changed to enhance the flexibility or stiffen the surface. To make the surface more compliant additional changes can be made such as making the section **102** thinner either in total or in selected areas. In this way the surface will fit more smoothly against the user's back or in supporting some other body part or item.

[0044] Connection nubs **112**, shown on the surface of chair side cushion section **101** are formed in a current preferred embodiment of the invention as cone-shaped extensions having a height between 1/32nd and 1/4th of an inch in length, more preferably between 1/16th of an inch and 1/8th of an inch and, even more preferably, about 3/32nds of an inch in length. Alternatively, a Velcro® hook and pile connector hook pad can be affixed to the outer surface of the chair side cushion section to serve the same purpose. The connection nubs **112** or hook and pile type connector serve the function of providing sufficient frictional contact with the seat after the user positions the body support cushion before the cushion is held in place by the force of the wearer's back on the cushion and chair. The connection is not so strong as to prevent the user from adjusting the position of body support cushion **100** in place once the user is seated on the chair.

[0045] Reference is next made to **FIGS. 6-13** wherein the body support cushion **100** is shown in its deployed state with tabs **106**, **107** engaged in slots **104**, **105**. To assemble the cushion from its storage condition as shown in **FIGS. 1**, **2** and **3** the user merely folds sections **101** and **102** along the hinge **103** exerting sufficient force to bend sections **101** and **102**, though primarily section **102** will deflect, until tabs **106**, **107** align with one of the series of slots **104**, **105** and then lock in place. Because of the absence of additional slots or other openings in section **101**, as are found on body side cushion section **102**, on chair side cushion section **101** and its smaller width as compared to body side cushion section **102** (which includes slits **108**, **109**, **110** and **111** and is wider, which enables section **102** to curve along an axis parallel to hinge **103** more easily than section **101**), chair side cushion section **101** tends to remain relatively flat in the deployed state. The effect of this, as seen in **FIGS. 7**, **9**, **11** and **13** is that the section **102** is more curved than section **101**. While the figures show the section **101** nearly straight there is generally some flexing of Section **101**, though not nearly as much as is found in section **102**. Section **101** is designed to be stiffer than Section **102** so that the tension in the cushion **100** is held by section **101** and stored in the curved section **102** like a spring.

[0046] While hinge **103** as shown in **FIGS. 1-5** is a living hinge which is continuous across the entire width of the connection between sections **101** and **102**, a living hinge or even a hinge formed with separate sections **101**, **102** is possible where, for example, there are two or three sections of hinges with hinge portions like the two or three hinges on a door. Alternatively, rather than having sections **301**, **302** permanently attached to each other, they can be removably attached as shown in the embodiments of **FIGS. 16 and 17**. In **FIG. 16**, portable support cushion **300** includes two discrete hooking hinges **331**, **332** which engage with slots **333** and **334**, respectively to allow sections **101**, **102** to rotate with respect to each other without otherwise moving laterally, much in the same way as the embodiment of **FIGS. 1-5**. Similarly, in the embodiment of **FIG. 17**, portable support cushion **400** includes two discrete sections **401**, **402** which are releasably connectable to each other with hook **431** and hook **432** which run along the length of sections **401**, **402**, respectively and engage in the same way as the living hinge or the embodiment of **FIG. 16**.

[0047] In another current preferred embodiment of the invention, as shown in **FIG. 19**, portable support cushion **600** includes sections **601**, **602** and hinge **103**(not shown), as in the embodiment of **FIGS. 1-5**, but also includes a second hinge **605** which divides section **602** into two sub-sections **603**, **604**. In its deployed mode, as shown, the cushion **600** takes on a triangular rather than curved profile on the top. This is suitable for applications like supporting under a wearer's knee or ankle or to support the leg or for supporting an item which would be held in place by the triangular shape of the support surface.

[0048] In a current preferred embodiment of the invention the body support cushion **100** including sections **101** and **102** and living hinge **103** are formed from polypropylene, which are injection molded. The cushion **100** is preferably made of sheets of polypropylene, such as 1/16 inch sheets, though different thicknesses are appropriate depending on the use of the cushion and the specific characteristics of the material used. Alternate plastics may be injection molded including Delrin® from DuPont and other plastics which exhibit the required physical characteristics which include the ability to form a living hinge, sufficient flexibility to allow the bending and supporting functions without splintering or cracking, and sufficient stiffness to create a tension force which provides the support in the cushion. The body support cushion can be manufactured from other materials which have the appropriate characteristics which are not plastics as well, though the current preferred embodiment is to injection mold polypropylene.

[0049] While slots **104**, **105** and tabs **106**, **107** are used in a current embodiment of the invention, other conventional connectors may also be suitably used such as pins and holes or the like. Also, as shown in **FIG. 18**, the portable support cushion **500**, including sections **501**, **502** connected by living hinge **503** are connected on the other end with hook and pile connectors **506** and **507**, **508**. In this embodiment there are only two pads **507**, **508** which can be selectively utilized with the pad **506** to allow adjustment. In other embodiments more rows of pads can be used as in the embodiment of **FIGS. 1-5** with four sets of slots. The only requirement is that the connection be sufficiently sturdy.

[0050] In a current preferred embodiment of the invention, in the flattened position the body support cushion has

D-3

Attorney's Docket No. 938257-000008

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re: E. Scott Davis et al.
Appl No.: 11/399,739
Filed: 04/07/2006
For: PORTABLE SUPPORT CUSHION

Confirmation No.: 1427
Group Art Unit: 3636
Examiner: Sarah Burnham McPartlin

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**RESPONSE TO RESTRICTION REQUIREMENT**

This is in response to the Office Action dated August 31, 2007, in which the Examiner has required restriction between the species: Group 1, namely Figures 1-15; Group 2, namely Figure 16; Group 3, namely Figure 17; Group 4, namely Figure 18; Group 5, namely Figure 19; Group 6, namely Figure 20; Group 7, namely Figure 21; Group 8, namely Figure 22; and Group 9, namely Figure 23. Applicant hereby elects without traverse the species illustrated in Group I, namely Figures 1-15, and expressly reserves the right to file divisional applications or take such other appropriate measures deemed necessary to protect the species in Groups 2-9. Applicant submits that Claims 1-20, 29-48, 56-72 and 80-82 are readable on the species of Group 1 and, furthermore, that Claims 1, 32, and 56 are generic.

Should the Examiner have further questions or comments with respect to examination of this case, it is respectfully requested that the Examiner telephone the undersigned so that further examination of this application can be expedited.

It is not believed that extensions of time or fees for net addition of claims are required, beyond those, which may otherwise be provided for in documents accompanying this paper. However, in the event that additional extensions of time are necessary to allow consideration of this paper, such extensions are hereby petitioned under 37 CFR § 1.136(a), and any fee required therefore (including fees for net addition of claims) is hereby authorized to be charged to Deposit Account No. 13-4365.

Respectfully submitted,

Henry B. Ward, III
Registration No. 42,212

**CUSTOMER NO. 24239**
**MOORE & VAN ALLEN PLLC**
430 Davis Drive, Suite 500
Post Office Box 13706
Research Triangle Park, NC 27709
Tel Charlotte Office (704) 331-1027
Fax Charlotte Office (704) 339-5800

**ELECTRONICALLY FILED USING THE EFS-WEB ELECTRONIC FILING SYSTEM OF THE UNITED STATES PATENT & TRADEMARK OFFICE ON March 18, 2008.**

D - 4